**E.I. DU PONT DE NEMOURS AND COMPANY, Plaintiff,**

v.

**BAYER CROPSCIENCE L.P., Defendant.**

**C.A. No. 3741–VCL.**

Court of Chancery of Delaware.

Submitted: July 16, 2008.
Decided: July 29, 2008.

---

Morris James LLP, Wilmington, Delaware; George L. Murphy, Jr., Esquire, Susan A. Cahoon, Esquire, Corin M. McCarthy, Esquire, Jason D. McLarry, Esquire, Kilpatrick Stockton LLP, Atlanta, Georgia, Attorneys for the Plaintiff.

Frank A. Monaco, Jr., Esquire, Kevin J. Mangan, Esquire, Womble Carlyle Sandridge & Rice, LLC, Wilmington, Delaware; Pressly M. Millen, Esquire, Christopher W. Jones, Esquire, Womble Carlyle Sandridge & Rice LLC, Raleigh, North Carolina, Attorneys for the Defendant.

P. Clarkson Collins, Jr., Esquire, Matthew F. Lintner, Esquire, Patricia Uhlenbrock, Esquire, Jason C. Jowers, Esquire,

## *OPINION*

LAMB, Vice Chancellor.

This opinion considers a request for a preliminary injunction concerning a supply agreement and license between two large chemical companies initially set to run from 2007 until 2015. That agreement relates to a patented chemical compound that can be usefully mixed with other patented or proprietary compounds for sale as "safened" herbicides in the United States corn growing market. The seller claims that the purchaser has breached the contract by introducing a new product line that exceeds the scope of the license and violates the terms of the supply agreement. The purchaser ultimately seeks a declaration that it has not violated the agreement and an order of specific performance. Pending resolution of the case on the merits, the purchaser seeks a preliminary injunction to ensure a continued supply of product until the case can be heard and decided on the merits.

The principal substantive question presented is whether the terms of the supply agreement and license permit the purchaser to combine or mix the supplied compound with active ingredients other than its own patented or proprietary compounds. The purchaser contends that the

contract language gives it the right to combine or mix the acquired compound with any patented or proprietary compounds it acquires from other manufacturers so long as one or more of its own identified compounds is included in the mixture. The seller contends that the supply agreement and license is less broad and limits the purchaser to including one or more of its own identified proprietary or patented compounds as the active ingredient in any mixture containing the licensed compound.

Applying the standard of review appropriate to a claim for specific performance of a contract, the court concludes that the purchaser has not shown a reasonable probability of success on the merits of its claim. On the contrary, the court's review of the contract itself and the extrinsic evidence adduced by the parties in connection with this request leads to a conclusion that the seller's interpretation is more likely the proper construction of the agreement at issue. In addition, the court concludes that the purchaser has shown that the balance of hardships weighs only marginally in its favor. For these reasons, the court will refuse to issue any preliminary injunctive relief.

## I.

The plaintiff, E.I. du Pont de Nemours and Company ("DuPont"), and the defendant, Bayer CropScience L.P. ("BCS"), are chemical manufacturing companies that sell crop protection products, including commercial herbicides, in direct competition with each other. The dispute in this case concerns one of BCS's proprietary chemicals, isoxadifen ethyl ("isoxadifen").

Isoxadifen is known as a "safener" because it "safens" certain herbicides that are used in corn fields to kill weeds. These herbicides sometimes cause incidental damage to the corn itself, but adding isoxadifen to the herbicides increases the corn's tolerance to the herbicide without detracting from the herbicide's effectiveness in killing the targeted weeds.

### A. *A Deal Is Struck*

Although DuPont and BCS are competitors, they have sometimes explored opportunities to work together for their mutual benefit. In or around 2001, DuPont and BCS[1] recognized that isoxadifen might create new commercially viable applications for DuPont's products, specifically herbicides containing DuPont-proprietary sulfonylurea ("SU") compounds. This was especially true given that DuPont's patents on many of its SUs were set to expire in the coming years, opening them to competition from generic herbicides. If DuPont could safen its SUs with BCS's proprietary isoxadifen, DuPont could differentiate its SU products from the generic market. To explore this opportunity, DuPont and BCS executed the Evaluation Agreement on May 2, 2001.

Under the Evaluation Agreement, BCS agreed to supply DuPont with a limited amount of isoxadifen so that DuPont could evaluate its performance in combination with SUs. This agreement was originally set to terminate on May 2, 2002, but the parties have executed extensions such that the new termination date is May 7, 2009.

It appears that during the years following execution of the Evaluation Agreement, DuPont and BCS continued dis-

1. The original agreement was between DuPont and Aventis CropScience S.A. Bayer CropScience S.A. ("Bayer"), an affiliate of BCS, later purchased Aventis and succeeded Aventis as a party to the Evaluation Agreement on May 26, 2003. BCS replaced Bayer as a party to the Evaluation Agreement on February 21, 2006. For ease of reference, the court refers to these preceding entities as BCS.

cussing collaborative projects involving isoxadifen and SUs. For instance, on June 8, 2004, DuPont made a presentation to BCS in Johnstown, Iowa reporting the results of combining isoxadifen with SUs, as well as non-SU herbicides ("non-SUs"). A May 4, 2005 email from DuPont to BCS also reflects discussions between DuPont and BCS about potential deals involving isoxadifen and SUs, with DuPont suggesting various combinations of isoxadifen and SUs, as well as non-SU herbicides such as a BASF proprietary chemical called dicamba, for use on various acreages.[2]

Starting in the fall of 2005, DuPont and BCS entered into more formal discussions on how they might cooperate commercially to their mutual benefit.[3] They dubbed these discussions "Project Ursula." Initially, the parties discussed broad areas of cooperation, including global cooperation in weed control, herbicides, bioscience, and seed treatment.[4] As Daniel Clark, a DuPont employee, testified, "Project Ursula was looking far, far beyond any simple supply agreement. It was looking at a range ... of potential ideas ... that went from [the] extreme [idea] of basically having one entity represent the portfolios of both companies from a business marketing and sales standpoint all the way down to something as simple as just program collaboration."[5]

Discussions continued and, over time, Project Ursula became more narrow in focus. Ultimately, discussions centered on opportunities in the United States corn market, including, but not limited to, the subject matter of the Evaluation Agreement, i.e. the combination of isoxadifen with DuPont's herbicides.[6] To this end, on December 1, 2005, DuPont delivered a presentation to BCS in Chicago, Illinois in which DuPont discussed how blending isoxadifen with its SU and non-SU herbicides could present new market opportunities for DuPont and BCS.

Several more months of discussions followed. These discussions culminated in the Project Ursula Term Sheet, signed by the parties in September 2006.[7] The term sheet outlined the ideas that resulted from the Project Ursula discussions, and was to act as the basis for definitive agreements executing those ideas. In total, the term sheet identified four projects, two of which were for the benefit of DuPont, and two of which were for the benefit of BCS. The first project—and the one at the center of this litigation—was to execute an agreement by which BCS would supply isoxadifen to DuPont. The second project similarly called for an agreement by which BCS would supply an herbicide known as isoxaflutole to DuPont. In exchange, DuPont agreed to require its Pioneer subsidiary to promote two BCS products. DuPont also agreed to include those products in DuPont's TruChoice program, a promotional program that combines sales to farmers with special incentives, such as lower financing for purchases of crop protection products.

After the parties signed the term sheet, BCS and DuPont set out negotiating the definitive terms of a supply agreement by which BCS would sell isoxadifen to Du-

---

2. Lintner Aff. Ex. 27.

3. Ferguson Dep. 74–76.

4. *Id.* at 75.

5. Clark Dep. 59:16–60:3.

6. Ferguson Dep. 74–76; Chaney Dep. 20:16–21; Clark Dep. 59:6–60:3.

7. Lintner Aff. Ex. 16. This copy of the term sheet is not executed by BCS, but several BCS witnesses testified that BCS did in fact execute a copy of it.

Pont. On May 10, 2007, these discussions ended with the execution of the contract at the center of this litigation—the Supply Agreement. This agreement recites that BCS possesses the proprietary rights to isoxadifen, while DuPont possesses proprietary rights to its SUs, and that Du-Pont wishes to "develop and market premixes and/or use blends of Isoxadifen which contain at least one of the SUs." The Supply Agreement further recites that "BCS wishes to sell and DuPont wishes to buy, Isoxadifen manufactured by BCS for the purpose of producing the 'Product(s)' (as further detailed below).... " Paragraph 1.6 of the Supply Agreement defines "Product(s)" as "a Du-Pont-branded herbicide product marketed by DuPont based upon a premix, unit area pack, and/or a blend of Isoxadifen and at least one of the SUs as defined below...." "SUs" are defined in paragraph 1.7 as specific DuPont compounds, including "Rimsulfuron, Nicosulfuron, Thifensulfuron, Chlorimuron Ethyl, Metsulfuron Methyl, and Tribenuron." The Supply Agreement also contains a license allowing DuPont "to formulate, offer for sale, sell, and/or use Isoxadifen, as supplied by BCS, in Product(s) in the Market and Territory for the Initial Term of this Agreement and any extensions thereof ...." [8] Paragraph 28(b) of the Supply Agreement states that it "shall be construed in accordance with and governed by the laws of the State of North Carolina." [9] The initial term of the Supply Agreement runs from May 10, 2007 until August 31, 2015.

## B. A Dispute Arises

Following execution of the Supply Agreement, DuPont developed two lines of isoxadifen-safened products—Resolve Q and Require Q. Resolve Q consists of two DuPont SUs, isoxadifen, and other inert ingredients. Require Q consists of one DuPont SU known as rimsulfuron, dicamba (a non-SU), and other inert ingredients. Both products received regulatory approval from the United States Environmental Protection Agency ("EPA") in January 2008 and were sold to corn growers in the United States in the 2008 crop season.

On February 8, 2008, BCS wrote a letter to DuPont in which BCS expressed its concern that DuPont was in breach of the Supply Agreement, as well as the Evaluation Agreement. Specifically, BCS complained that, in violation of the Supply Agreement, DuPont had filed various patent applications referencing isoxadifen without obtaining BCS's prior approval. BCS further contended that, under the Supply Agreement, DuPont was allowed to combine isoxadifen only with SU herbicides. Require Q, however, contained a second non-SU herbicide, i.e. dicamba. Therefore, BCS argued, Require Q exceeded the scope of DuPont's rights to use isoxadifen, and DuPont had breached the Supply Agreement by registering the product with the EPA. Finally, BCS contended that DuPont had violated the Supply Agreement by using the phrase "DuPont Q brand safener technology" in a publication announcing its release of Resolve Q and Require Q. DuPont responded by email, denying that it was in breach,

8. Supply Agreement ¶ 7.1.

9. Because much of the activity underlying this action occurred in North Carolina, the court will honor this choice of law provision. See J.S. Alberici Const. Co. v. Mid–West Conveyor Co., 750 A.2d 518, 520 (Del.2000) (holding that Delaware courts generally honor contrac-

tually-designated choice of law provisions so long as the jurisdiction selected bears some material relationship to the transaction) (citing Annan v. Wilmington Trust Co., 559 A.2d 1289, 1293 (Del.1989)); see also Postorivo v. AG Paintball Holdings, Inc., 2008 WL 343856, at *4 (Del.Ch. Feb. 7, 2008).

and the parties had a telephone call on the subject on March 4, 2008.

Dissatisfied with DuPont's response, BCS sent another letter on March 13, 2008 stating that it "remain[ed] convinced" that DuPont was in breach of the Supply Agreement and Evaluation Agreement.[10] BCS offered DuPont 60 days to cure these alleged breaches, and stated that "[f]ailing adequate remedy within the sixty-day period, BCS will have the right to terminate [the Supply Agreement]."[11] BCS then outlined the actions it thought DuPont would have to take in order to cure the alleged breaches.

Two weeks later, on March 26, 2008, DuPont sent BCS a purchase order for its 2009 isoxadifen requirements, and specified that the order had to ship from BCS's facility in Germany by August 4, 2008 to ensure it arrived in the United States in time for the next crop season. On April 15, 2008, DuPont also sent BCS a letter denying that it had breached any agreement, and disputing BCS's right to terminate the Supply Agreement. After setting out its interpretation of the relevant provisions, DuPont stated it "believes that discussing our respective positions beyond this letter would be mutually beneficial,"[12] and requested that BCS respond by April 25, 2008. BCS never responded, and no further discussions took place.

### C. *Suit Is Filed*

On May 5, 2008, DuPont filed a complaint in this court seeking a declaration that it has not breached the Supply Agreement, specific performance of the contract, a permanent injunction against BCS preventing it from terminating the Supply Agreement, a preliminary injunction directing BCS to perform under the Supply Agreement during the pendency of this action, and a temporary restraining order preventing BCS from terminating the agreement during the pendency of DuPont's request for a preliminary injunction.[13]

On June 30, 2008, DuPont filed its request for preliminary injunction, asserting that it has not breached the Supply Agreement and that it will be irreparably harmed if BCS is not preliminarily enjoined from terminating the Supply Agreement before the August 4 shipment date. BCS responded by advancing arguments similar to those initially raised in its letters to DuPont. However, BCS no longer contends that DuPont has breached the Supply Agreement by filing patents referencing isoxadifen or using the phrase "DuPont Q brand safener technology" in press releases. Rather, BCS argues these acts justify the application of the doctrine of unclean hands. BCS also maintains that DuPont has breached the Supply Agreement by mixing isoxadifen with non-SUs, and that BCS may terminate the contract under paragraph 13 of the Supply Agreement.[14]

The parties engaged in discovery and briefed DuPont's request for a preliminary

---

10. Compl. Ex. B.

11. *Id.*

12. *Id.* at Ex. C.

13. On May 5, 2008, BCS filed a complaint in Superior Court in Durham County, North Carolina alleging breach of contract. BCS also later filed in this court a motion to dismiss DuPont's complaint for lack of subject matter jurisdiction or, alternatively, to stay in favor of the North Carolina action. That motion was denied on July 2, 2008.

14. BCS sent a letter to DuPont on May 12, 2008 purporting to terminate the Supply Agreement.

injunction. On July 16, 2008, this court heard oral argument on that request and reserved opinion. This is the court's ruling on DuPont's request for a preliminary injunction.

## II.

■ A request for preliminary injunction "requires judicial conjecture as to what that record might become and what legal conclusions and consequences will flow from it, in effect requiring a preliminary pronouncement concerning the merits of a cause before the facts are fully developed." [15] Due to the conjectural nature of such actions, this court orders interlocutory injunctive relief "only upon a persuasive showing that it is urgently necessary, that it will result in comparatively less harm to the adverse party, and that, in the end, it is unlikely to be shown to have been issued improvidently." [16]

■ The court will grant a preliminary injunction only where the movant demonstrates (1) a reasonable probability of ultimate success on the merits at trial; (2) that the failure to issue a preliminary injunction will result in immediate and irreparable injury before the final hearing; and (3) that the balance of hardships weighs in the movant's favor. [17] " '[A] strong demonstration as to one element may serve to overcome a marginal demonstration of another.' " [18]

### A. *Success On The Merits*

■ The probability of success standard is "unique to applications for interlocutory injunctive relief." [19] According to this standard, disputed issues of fact will be found in favor of the moving party "if it appears after evaluating all of the evidence in the record that there is a reasonable likelihood that on final hearing that fact will be so established" by the proper stan-

---

15. Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 10.02[a] (2008) (citations omitted) [hereinafter "Wolfe & Pittenger"]; *cf. Paramount Commcn's Inc. v. Time Inc.*, 1989 WL 63122, at *2 (Del.Ch. June 9, 1989) (stating "[a] motion for a temporary restraining order is, by reason of its hurried, sometimes *ex parte* nature, a poor occasion for a court to make any but the most evident legal conclusions. . . .").

16. Wolfe & Pittenger § 10.02[a].

17. *See, e.g., Louisiana Mun. Police Employees' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1185 (Del.Ch.2007). BCS claims DuPont actually seeks a mandatory injunction, which requires the applicant seeking relief to "clearly establish the legal right he seeks to protect or the duty he seeks to enforce." *Bertucci's Rest. Corp. v. New Castle County*, 836 A.2d 515, 519 (Del.Ch.2003). According to BCS, DuPont is requesting a mandatory injunction, rather than simply a preliminary injunction, because DuPont seeks an order requiring BCS to perform under the Supply Agreement for the remainder of the term of the Supply Agree-

ment. The court does not read DuPont's request in the same way. Rather, DuPont seeks only an order enjoining BCS from taking any action delaying the August 4, 2008 shipment of isoxadifen. *See* Mot. for Prelim. Inj. ¶ 1. The Supply Agreement, however, extends to 2015, and, should this matter ultimately go to trial, "the parties will naturally have an opportunity to further develop the . . . record of this case in an effort to prove additional and, if the evidence so justifies, different factual findings." *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 539 n. 1 (Del.Ch. 2000). Even were the court to enjoin BCS from refusing to ship the isoxadifen, the case could still proceed to full trial to determine whether BCS must deliver isoxadifen in subsequent years. As a result, the heightened standard used to review mandatory injunction applications is inapplicable here.

18. *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2008 WL 902406, at *3 (Del.Ch. Apr. 3, 2008) (quoting *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *3 (Del.Ch. Nov. 5, 2004)).

19. Wolfe & Pittenger § 10.02[b][2].

dard of review.[20] Stated differently, disputed facts will be resolved "on the basis of how the dispute would probably be resolved at trial."[21] Consequently, a movant's probability of success on the merits "depends critically" on the standard of review applied if the case were to go to full trial.[22] Here, DuPont seeks specific performance of the Supply Agreement,[23] meaning at trial DuPont would have to establish its entitlement to specific per-

formance by "clear and convincing evidence."[24] The question therefore becomes whether DuPont has demonstrated a reasonable likelihood that, at trial, it will establish by clear and convincing evidence that the Supply Agreement allows DuPont to mix isoxadifen with non-SUs, such as dicamba.

With this in mind, the court turns to the language of the Supply Agreement as

20. *Paramount Communications Inc. v. Time Inc.*, 1989 WL 79880, at *2 (Del.Ch. July 14, 1989).

21. *CPM Indus., Inc. v. Fayda Chems. & Minerals, Inc.*, 1997 WL 762650, at *1 n. 1 (Del.Ch. Dec. 1, 1997).

22. *T. Rowe Price*, 770 A.2d at 551.

23. Compl. ¶ 18.

24. The parties are in accord that North Carolina law governs the substantive aspects of the contractual claims before the court. However, the parties did not brief whether Delaware or North Carolina law defines what the burden of proof on DuPont's claim for specific performance would be at trial. *See In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 53 (Del.Ch.2001) (noting "[t]he question of *which* party has the burden of proof may be seen as purely procedural. But the question of *what* the burden of proof is typically constitutes a policy judgment designed to affect the outcome of the court's decision on the merits.") (emphasis in original).

Fortunately, both Delaware and North Carolina law require a party seeking specific performance of a contract to establish the existence and terms of the contract by clear and convincing evidence. *See Minnesota Invco of RSA No. 7, Inc. v. Midwest Wireless Holdings LLC*, 903 A.2d 786, 793 (Del.Ch.2006); *Durand v. Snedeker*, 177 A.2d 649, 652 (Del.Ch. 1962) (holding "it is well established that specific performance will not be decreed unless the existence and terms of the contract are established by that high degree of proof which has been variously characterized by the terms 'clear,' 'clear and convincing,' 'clear and satisfactory' or other equivalent expres-

sions") (citations omitted); *North Carolina Med. Soc'y v. North Carolina Bd. of Nursing*, 169 N.C.App. 1, 610 S.E.2d 722, 727–28 (2005); *Munchak Corp. v. Caldwell*, 46 N.C.App. 414, 265 S.E.2d 654, 657 (1980) (holding that " '[a] court of equity is not authorized to order the specific performance of a contract which is not certain, definite and clear, and so precise in all of its material terms that neither party can reasonably misunderstand it' "); 71 Am.Jur.2d *Specific Performance* § 227 (stating "unless the terms of the contract, the consideration on which it was founded, and the time of its execution are clearly established, or if there is reasonable doubt as to any of these things, equity will not grant relief"). *But see In re IBP*, 789 A.2d at 54 n. 98 (noting "[g]iven that one can recover contractual damages simply by proving a contractual breach by a preponderance, it is somewhat inefficient to have the breach determination be governed by a different evidentiary burden solely because the plaintiff seeks specific performance. But that higher merits burden may be thought important to advance ... public policy."). Further, under both Delaware's and North Carolina's adoption of the Uniform Commercial Code, a party seeking specific performance of a contract for the sale of goods needs only to establish only by a preponderance of the evidence that the goods at issue are unique or the circumstances are such that specific performance is appropriate. *See* N.C. Gen.Stat. § 25–2–716(1), cmt. 1; 6 *Del. C.* § 2–716(1), cmt. 1; 7 *Causes of Action* 437 §§ 4, 15 (2007) (advising that a party seeking specific performance must show "by a preponderance of the evidence that the goods are unique or the circumstances are such that specific performance is appropriate," but noting that "various other factors affect the availability of specific performance ... [including] ... whether the

interpreted under North Carolina law. In North Carolina, "a court ... interpret[s] a contract by examining its language for indications of the parties' intent at the moment of execution. The intention of the parties must be gathered and viewed from the four corners of the instrument. If only one reasonable interpretation exists, the courts must enforce the contract as written...." [25] In conducting this review, courts must look at contracts "according to their entirety." [26] In addition, "ordinary terms are to be given their meaning in ordinary speech." [27] "If a contract contains language which is ambiguous, a factual question exists, which must be resolved by the trier of fact," [28] and "parol evidence is admissible to show and make certain the intention behind the contract." [29] An ambiguity exists if " 'the language of the [contract] is fairly and reasonably susceptible to either of the constructions asserted by the parties.' " [30]

This dispute is focused on two related provisions in the Supply Agreement: the

second sentence of the recitals, and paragraph 1.6. The former states that one reason the parties entered into the contract is that "DuPont wishes to develop and market premixes and/or blends of Isoxadifen which contain at least one of the SUs, which will be packaged and marketed by DuPont." Paragraph 1.6 provides the definition of the term "Product(s)," and defines that term as "a DuPont-branded herbicide product marketed by DuPont based upon a premix, unit area pack, and/or blend of Isoxadifen and at least one of the SUs as defined [in paragraph 1.7]...." DuPont argues that Require Q, which consists of isoxadifen, an SU called rimsulfuron, and dicamba as a third active ingredient, is quite literally a blend of isoxadifen and at least one SU. BCS maintains that the parties intended that DuPont mix isoxadifen with one or more SUs, but that DuPont not add any other active ingredients to that combination.

terms of the contract are clear, definite, and certain ...").

**25.** *Fairview Devs., Inc. v. Miller*, 652 S.E.2d 365, 367 (N.C.Ct.App.2007); *see also State v. Philip Morris USA Inc.*, 359 N.C. 763, 618 S.E.2d 219, 225 (2005); *Walton v. City of Raleigh*, 342 N.C. 879, 467 S.E.2d 410, 411 (1996) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract.") (citing *Lane v. Scarborough*, 284 N.C. 407, 200 S.E.2d 622, 624–25 (1973)); *Cater v. Barker*, 172 N.C.App. 441, 617 S.E.2d 113, 116–17 (2005) ("It is a well-settled principle of legal construction that '[i]t must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean.' When a court is called upon to interpret, it seeks to ascertain the intent of the parties at the moment of execution.") (quoting *Hagler v. Hagler*, 319 N.C. 287, 354 S.E.2d 228, 234 (1987)).

**26.** *CB & H Bus. Servs. v. J.T. Comer Consulting, Inc.*, 184 N.C.App. 720, 646 S.E.2d 843,

844 (2007) (citing *Stephens Co. v. Lisk*, 240 N.C. 289, 82 S.E.2d 99, 102 (1954)).

**27.** *S. Furniture Co. of Conover, Inc. v. Dep't of Trans.*, 133 N.C.App. 400, 516 S.E.2d 383, 386 (1999) (citations omitted); *see also Cater*, 617 S.E.2d at 116–17 ("Presumably the words which the parties select were deliberately chosen and are to be given their ordinary significance.") (quoting *Hagler*, 354 S.E.2d at 234); *Charlotte Eastland Mall, LLC v. Sole Survivor, Inc.*, 608 S.E.2d 70, 72 (N.C.Ct.App. 2004) (collecting citations).

**28.** *Mayo v. North Carolina State Univ.*, 168 N.C.App. 503, 608 S.E.2d 116, 120 (N.C.Ct. App.2005)

**29.** *Dockery v. Quality Plastic Custom Molding, Inc.*, 144 N.C.App. 419, 547 S.E.2d 850, 852 (2001).

**30.** *Carolina Place Joint Venture v. Flamers Charburgers, Inc.*, 145 N.C.App. 696, 551 S.E.2d 569, 571 (2001) (quoting *Taha v. Thompson*, 120 N.C.App. 697, 463 S.E.2d 553, 556 (1995)).

If one reads the provisions literally, and in isolation, then DuPont's interpretation is not plainly wrong—Require Q is an herbicide with at least one SU. This reading, however, ignores the entirety of the contract. When reading the Supply Agreement, one must remember that it is a license from BCS to DuPont to use isoxadifen, a patented chemical proprietary to BCS. In effect, BCS is giving DuPont permission to use its property in a limited way.[31] Indeed, paragraph 7.1 of the Supply Agreement provides that "BCS retains all other rights to BCS patents and intellectual property not expressly granted herein, including, but not limited to the rights to make, formulate, offer for sale, sell and/or use Isoxadifen alone or in premixes and/or blends." This narrows the scope of DuPont's rights under the Supply Agreement, limiting DuPont to those uses that are expressly granted in the Supply Agreement.

Here, DuPont has used isoxadifen to create a product that contains isoxadifen, at least one SU, and a third, non-SU active ingredient.[32] Yet nothing in the Supply Agreement expressly allows DuPont to mix isoxadifen with non-SUs. Therefore,

DuPont's use of isoxadifen is reasonably seen as exceeding the scope of the Supply Agreement, putting DuPont in breach.[33] For this reason, based on the plain language of the Supply Agreement itself, DuPont has not demonstrated a reasonable likelihood of success on the merits, whether the standard at trial is clear and convincing evidence or a preponderance of the evidence.

Moreover, DuPont has not demonstrated that the parol evidence will probably require a different result after trial. The testimony of BCS's negotiators Dr. Georgina Werner, Stephen Chaney, and Bill Ferguson was unequivocal that during negotiation of the Supply Agreement, DuPont never expressly told BCS it wanted the Supply Agreement to allow mixing isoxadifen with non-SUs. Documents created contemporaneously with the negotiation of the Supply Agreement in the latter half of 2006 support this testimony, describing the agreement as one allowing DuPont to blend isoxadifen with SUs only. For instance, in an August 1, 2006 email from Tim Chicoine (a DuPont negotiator) to Clark, and later forwarded to Ferguson by

---

**31.** *See Moore's Ferry Dev. Corp. v. City of Hickory,* 166 N.C.App. 441, 601 S.E.2d 900, 905 (2004) (stating "[a] license is 'a permission, usually revocable, to commit some act that would otherwise be unlawful'") (quoting *Black's Law Dictionary* 938 (8th ed. 2004)).

**32.** *See* Ferguson Dep. 143:14–20 ("A. [BCS] would view SU products as products containing—as you said containing SUs but only SUs. If—I wouldn't refer to something as an SU product that had something—an active ingredient in addition to an SU in it. For instance, in this case dicamba, I would call that an SU-dicamba product.").

**33.** DuPont also contends that BCS's construction of the Supply Agreement is so narrow that it would arguably prevent DuPont from adding the weighting agents, emulsifiers, and diluents that are needed to make the "Prod-

uct(s)" because, according to BCS's interpretation, "Product(s)" must consist solely of isoxadifen and one or more SUs. DuPont argues that nothing in the Supply Agreement provides for the addition of such inactive ingredients, and that, therefore, BCS's construction, in contravention to North Carolina law, requires the court to add new provisions to the contract. This argument is unconvincing. Paragraph 1.6 defines "Product(s)" as an herbicide "based upon" a blend of isoxadifen and an SU. The use of the phrase "based upon" suggests that the main active ingredients in the herbicide are an SU and isoxadifen, and that DuPont may add whatever other incidental inert ingredients are needed to make the combination of SU and isoxadifen a functional product. Further, the recitals make clear that the parties were concerned with dictating the use of active ingredients, not inert ones.

DuPont employee Andreas Krueger, Chicoine explained that "We agreed to expand the agreement to apply to any DuPont proprietary sulfonylurea for use in corn."[34] Further, before BCS entered into the Supply Agreement, it entered into a supply agreement with a third chemical company in which it granted that third company an exclusive right to mix isoxadifen with dicamba.[35] These facts undercut DuPont's interpretation of the Supply Agreement.

■ DuPont relies principally on four types of parol evidence to support its interpretation of the Supply Agreement: (1) presentations made to BCS in 2004 and 2005 in which DuPont told BCS it wanted to mix isoxadifen with non-SUs; (2) testimony from two DuPont negotiators that they informed BCS during negotiation of the Supply Agreement of DuPont's intent to mix isoxadifen with non-SUs; (3) a joint DuPont–BCS press release in September 2006 announcing DuPont would be using isoxadifen in products BCS knew contained non-SUs; and (4) drafts of the Supply Agreement. These facts do not alter the court's conclusions.

The presentations on which DuPont relies were made in 2004 and 2005, both before and during the early Project Ursula discussions.[36] BCS's witnesses did not deny seeing these presentations, and it was generally conceded that in 2004 and 2005 DuPont had informed BCS it wanted to mix isoxadifen with non-SUs. However, BCS's witnesses testified that those discussions were separate from the negotiation of the Supply Agreement, and had broken down before the Supply Agreement negotiations began in 2006. In the words of Chaney, BCS "walked away" from DuPont on those negotiations.[37] Indeed, there is no documentary evidence in the record contemporaneous with the negotiations surrounding the Supply Agreement in 2006 indicating that DuPont conveyed to BCS its intent to mix isoxadifen with non-SUs.

This testimony is consistent with the progression of the Project Ursula discussions, which began with broad ideas, including a merger of the two companies, and gradually narrowed in scope, first to a deal involving the corn market in the United States, and then more specifically to a deal involving isoxadifen and SUs. Thus, BCS may have known that DuPont wanted to mix isoxadifen with non-SUs, but the parol evidence available at this stage, especially the testimony of the witnesses, suggests that the parties had ceased considering such ideas by the time they executed the Supply Agreement.

Nor is the testimony of DuPont's negotiators particularly convincing. Chicoine testified that sometime around August 2006, DuPont told BCS that it wanted to safen non-SU products, and used Steadfast ATZ, which contains a non-SU called Atrazine, as an example.[38] Clark testified that he remembered a phone call in the fall of 2006 in which DuPont told BCS it wanted to mix isoxadifen with Steadfast ATZ.[39]

---

34. Millen Aff. Ex. E; *see also* Lintner Aff. Ex. 32 (2006 BCS internal email).

35. The terms of this agreement are highly confidential and subject to a stipulation governing the exchange of confidential material.

36. *See* Lintner Aff. Ex. 26 (June 8, 2004 presentation to BCS); *id.* at Ex. 27 (May 2005 email to BCS); *id.* at Ex. 29 (December 1, 2005 DuPont presentation); *id.* at Ex. 30 (2005 presentation to BCS); Millen Aff. Ex. N (December 1, 2005 DuPont presentation to BCS).

37. Chaney Dep. 131:11.

38. Chicoine Dep. 156:3–157:18, 200:12–201:17.

39. Clark Dep. 86:14–88:12, 91:23–97:13.

However, the testimony of both witnesses was extremely vague on the details of the conversations-including when they occurred, what exactly was said, and who said what. In light of the unequivocal testimony from BCS's witnesses, and the lack of contemporaneous documentation supporting the DuPont witnesses' testimony, DuPont has not demonstrated a reasonable likelihood of success on this issue.

DuPont's argument as to the 2006 joint press release fares no better. That release states that "DuPont Crop Protections will acquire access to the Bayer CropScience products isoxadifen and isoxaflutole for exclusive use with DuPont's corn sulfonylurea products. The isoxadifen will provide enhanced crop tolerance under stress conditions to DuPont products in corn, including Steadfast, Accent, Stout, and Resolve brands."[40] According to DuPont, BCS's negotiators knew that these "brands" included products, specifically Steadfast ATZ and Accent Gold, that contained non-SUs. Therefore, DuPont argues, the joint release demonstrates BCS knew and intended that DuPont would mix isoxadifen with non-SUs.

Werner and Chaney testified that they knew the Steadfast and Accent brand lines contained products with non-SUs, specifically Steadfast ATZ and Accent Gold. However, Chaney testified that "Steadfast" was the name of an individual product, and that he believed the press release referred only to that product, not all DuPont products with the word "Steadfast" in its name.[41] Likewise, Werner testified

that while negotiating the Supply Agreement, she knew only the common chemical name of what DuPont wanted to mix isoxadifen with, not the brand names of the chemicals DuPont sought to include as part of the agreement.[42] Ferguson testified that he did not know that Steadfast ATZ and Accent Gold contained non-SUs.[43] Thus, the press release does not establish that the parties intended to allow DuPont to mix isoxadifen with non-SUs.

Finally, the drafts of the Supply Agreement simply affirm the court's reading of the Supply Agreement. The earliest draft Supply Agreement in the record was sent by BCS to DuPont on September 18, 2006.[44] The second recital in that draft stated: "DuPont wishes to develop and market premixes and/or blends of Isoxadifen with the SUs only." Paragraph 1.6 defined "Product(s)" as "a DuPont branded herbicide product marketed by DuPont based upon a premix and/or blend of: (i) Isoxadifen and any of the SUs defined below."[45] DuPont returned this draft on October 4, 2006, changing the recital to read: "DuPont wishes to develop and market premixes and/or blends of Isoxadifen which contain SUs." DuPont also changed paragraph 1.6 to define "Product(s)" as "an herbicide product marketed by DuPont based upon a premix, unit area pack, and/or blend of Isoxadifen and at least one of the SUs as defined below."[46] In a third draft, BCS accepted these changes, and further changed the second recital so that it read: "DuPont wishes to develop and

40. Lintner Aff. Ex. 31.

41. Chaney Dep. 145:10–15 ("Q. This thing says including. These are not naming individual products, are they? It says including Steadfast, Accent, Stout and Resolve brands. A. Those are all names of individual products.").

42. Werner Dep. 83:13–15.

43. Ferguson Dep. 94:1–7.

44. Second Lintner Aff. Ex. 45.

45. The term "SUs" is defined in Paragraph 1.7 of that draft.

46. Lintner Aff. Ex. 23.

market premixes and/or blends of Isoxadifen which contain at least one of the SUs."[47] DuPont now argues that the fact the parties replaced the phrase "SUs only" in the second recital with the less restrictive "at least one of the SUs," and replaced the phrase "any of the SUs defined below" in the definition of "Product(s)" with the phrase "at least one of" indicates the parties' intent that DuPont be allowed to mix isoxadifen with non-SUs.

There is a more convincing explanation for these changes. Werner testified that DuPont wanted to mix isoxadifen with more than one SU, and was concerned that the phrase "any of the SUs" could be read as limiting its ability to do so. Therefore, BCS agreed to replace the phrase "any of the SUs" in paragraph 1.6 with the phrase "at least one of the SUs," with which DuPont was more comfortable.[48] Werner also testified that BCS agreed to DuPont's deletion of the word "only" from the second recital because DuPont made the change to address BCS's concern that DuPont not sell isoxadifen by itself.[49] Then, BCS changed the recital page to include the phrase "at least one of" so that it was consistent with the definition of "Product(s)." These alternate explanations for the drafting history undercut the sugges-

tion that BCS intended to drastically expand the scope of the agreement.

Importantly, these explanations are supported by the fact that the material terms of the Supply Agreement had been set by the time BCS agreed to delete the word "only" from the second recital; in the fall of 2006, BCS and DuPont executed the Project Ursula Term Sheet. As Werner testified, "the terms of the supply agreement were negotiated during Project Ursula," and the Supply Agreement was simply an attempt to provide detail to those terms.[50] The term sheet clearly indicates that the parties intended DuPont to mix isoxadifen with SUs only, providing in relevant part that "Isoxadifen supplied by BCS may be used with current and/or identified SU products by DuPont in corn (Rimsulfuron, Nicosulfuron, Thifensulfuron, Chlorimuron Ethyl, Metsulfuron Methyl, and Tribenuron)."[51] Given Werner's testimony, one would not expect the parties to still be negotiating material terms, such as whether DuPont could mix isoxadifen with non-SUs, at the time the word "only" was deleted, *i.e.* after the term sheet was executed. Rather, one would expect that in this case, the parties were simply refining the contract language to ensure it accurately reflected the material agreements previously identified in the term sheet.[52] For all of these reasons,

47. *Id.* at Ex. 24.

48. Werner Dep. 144:5–15.

49. *Id.* at 139:15–17.

50. *Id.* at 65:16–66:7, 120:2–8 ("A. I believe that I may have seen it because I was involved in the construction of the supply agreement. So the terms of—a term sheet that would have been created perhaps during Ursula was the basis for the supply agreement, so I would have seen it.").

51. Lintner Aff. Ex. 16.

52. For the same reason, the court disagrees with DuPont's argument that BCS's explana-

tions for the changes in the draft agreements are nonsensical. According to DuPont, the draft agreements were already clear on these points, and therefore the changes were not needed. However, parties will often try to make contracts more clear even if it seems redundant to do so. In light of the term sheet, that seems to be precisely what occurred here: "blends of Isoxadifen which contain at least one SU" is much clearer than the rather clumsy "blends of Isoxadifen with the SUs only," and "at least one of the SUs as defined below" more clearly allows use of multiple SUs than "any of the SUs defined below."

DuPont has not demonstrated a reasonable probability of success on the merits at full trial, and therefore its request for preliminary injunction will be denied.

B. *Irreparable Harm And The Balance Of Hardships*

In addition to failing to persuade the court it has a reasonable likelihood of success on the merits, DuPont has not shown that the balance of hardships calls for an injunction. DuPont has shown irreparable harm. Isoxadifen is a unique good. If at full trial it turns out that DuPont was allowed to mix isoxadifen and non-SUs, it will have missed out on an opportunity to sell a new product during a peak selling season and will suffer a loss of goodwill. Moreover, DuPont has demonstrated at this stage of the litigation that it will be difficult to accurately determine damages because Require Q and Resolve Q are so unique and new to the market.[53]

At the same time, however, BCS would also suffer irreparable harm if the court were to enjoin BCS, and BCS were later vindicated. In the 2008 crop season, BCS introduced a new product called Laudis, with which Require Q directly competes.[54] Thus, it will suffer irreparable harm similar in nature to DuPont—reduced sales of a relatively new product for which damages will be difficult to calculate. As a result, the balance of hardships weighs only marginally in favor of DuPont. Given DuPont's failure to demonstrate a reasonable likelihood of success on the merits, the balance of hardships does not warrant preliminary injunctive relief.[55]

## III.

For the reasons stated above, the request for preliminary injunction is DENIED.[56] IT IS SO ORDERED.

53. *See Baxter Pharm. Prod., Inc. v. ESI Lederle Inc.*, 1999 WL 160148, at *6 (Del.Ch. Mar. 11, 1999); *CPM Indus., Inc.*, 1997 WL 762650, at *6; N.C. Gen.Stat. § 25–2–716(1), cmt. 1; 6 *Del. C.* § 2–716(1), cmt. 1.

54. Chaney Dep. 157:21–158:25.

55. *Concord Steel*, 2008 WL 902406, at *3 (stating " 'a strong demonstration as to one element may serve to overcome a marginal demonstration of another' ") (quoting *Alpha Builders*, 2004 WL 2694917, at *3).

56. Because the court finds that DuPont has not demonstrated that a preliminary injunction is warranted, the court does not address BCS's argument that the doctrine of unclean hands is applicable to this case.