610 S.E.2d 722 (2005)
NORTH CAROLINA MEDICAL SOCIETY, North Carolina Society of Anesthesiologists, Inc., Eric W. Mason, M.D., and the North Carolina Medical Board f/k/a the Board of Medical Examiners of the State of North Carolina, Petitioners
v.
NORTH CAROLINA BOARD OF NURSING, Respondent.
No. COA04-682.
Court of Appeals of North Carolina.
March 15, 2005.
*723 Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Susan H. Hargrove, Dana E. Simpson, and Candice M. Murphy-Farmer, Raleigh, for petitioners North Carolina Medical Society, North Carolina Society of Anesthesiologists, Inc., and Eric W. Mason, M.D.
Marcus Jimison and Thomas W. Mansfield, Raleigh, for petitioner North Carolina Medical Board f/k/a the Board of Medical Examiners of the State of North Carolina.
Howard A. Kramer; Womble Carlyle Sandridge & Rice, P.L.L.C., by Johnny M. Loper, Leighton P. Roper, III, and John W. O'Tuel, III, Raleigh, for respondent.
BRYANT, Judge.
North Carolina Board of Nursing (BON) (respondent) appeals an order filed 31 December 2003, denying respondent's motion for enforcement of a consent order as against North Carolina Medical Society (Medical Society), North Carolina Society of Anesthesiologists, Inc. (NCSA), Eric W. Mason, M.D., and the North Carolina Medical Board f/k/a the Board of Medical Examiners of the State of North Carolina (Medical Board), (petitioners).
On 6 August 2003, BON filed a motion for enforcement of consent order seeking, primarily, an order from the trial court directing the Medical Board to remove language from a Medical Board position statement that stated that anesthesia administered in an office-based surgical setting should either be administered by an anesthesiologist, or by a certified registered nurse anesthetist (CRNA) under the supervision of a physician. BON contends the Medical Board's position statement constituted a violation of the 1994 consent order between the parties. Contemporaneous with the filing of its motion, BON served upon the Medical Board certain requests for discovery.
On 6 October 2003, petitioners filed a motion for protective order seeking an order that "discovery not be had with respect to the motion to enforce the consent order." The motion to enforce the consent order was calendared for hearing on 27 October 2003 in Wake County Superior Court.
Prior to the hearing date, counsel for the Medical Society requested a continuance. Counsel for BON wrote the trial court administrator for Wake County stating that, in his opinion, "good cause" did not exist for moving the hearing date and that BON needed the "requested discovery in order to appropriately argue the motion."
The matter came for hearing at the 27 October 2003 civil session of Wake County Superior Court with the Honorable Evelyn W. Hill presiding. At the hearing, counsel for BON did not make a motion to compel responses to his discovery requests, nor did he seek a continuance of the hearing so that BON could have discovery before proceeding with the hearing. After oral argument, the trial court took the matter under advisement and requested that the parties submit post-hearing briefs and/or any other materials or documents that they wished to have the court consider. The trial court stated it would advise counsel by 1 December 2003 if the trial court would require additional presentation or argument prior to rendering a decision.
Both parties provided the trial court with supplemental briefs on or about 17 November 2003. On 25 November 2003, petitioners provided the trial court with an exhibit to their 17 November 2003 brief in the form of a consent order between the Medical Board and Peter Loren Tucker, M.D., which had been entered into on 20 November 2003. On 30 December 2003, the trial court entered an order denying BON's motion to enforce the 1994 consent order.
Respondent gave timely notice of appeal.

Facts
In 1992, BON proposed an administrative rule, 21 N.C.A.C. 36.0226 (rule . 0226), that would expand the scope of practice of a CRNA. The proposed rule sought to change the relationship between a CRNA and a physician from a relationship where the physician supervised the CRNA, to a relationship in which the CRNA worked in collaboration with a physician. During the rulemaking process and prior to final adoption of the *724 proposed rule, NCSA, requested that BON adopt a similar, but different rule.
NCSA proposed that BON include the statutory language of N.C. Gen.Stat. § 90-171.20(7)(e)[1] and (f)[2], requiring the supervision of a licensed physician when a nurse performed acts that required the making of a medical diagnosis or the implementation of a treatment or pharmaceutical regimen. BON rejected NCSA's request.
On 19 November 1993, the Medical Board issued a series of declaratory rulings declaring that many of the activities described in proposed rule .0226 constituted the practice of medicine (i.e., the making of a medical diagnosis and/or implementation of a treatment or pharmaceutical regimen). Despite the objections, declaratory rulings, and requests that a different rule be adopted, BON adopted rule .0226 with an effective date of 1 July 1993.
Petitioners requested judicial review of rule .0226 in August 1993 and February 1994. In their August 1993 petition for judicial review, petitioners wrote the following:
In such petition [Petition for Adoption of Rules], the Board of Nursing was requested to adopt rules substantially similar to the rules that were being considered by the Board of Nursing (and which have since been adopted), but with brief yet vital revisions limited to bringing the rules within the scope of the Board of Nursing's statutory authority and the General Assembly's statement of the bounds of the scope of the practice of nursing by a registered nurse. The requested changes merely include the statutory language relating to supervision by a licensed physician and implementing medical treatment regimens only as prescribed by a person so authorized under State law.
(emphasis added).
In March 1994, the Medical Board moved to intervene in the judicial review actions. On 21 September 1994, the parties executed a consent order resolving the petitions for judicial review. In resolving the dispute between the parties, the consent order provided, in pertinent part, as follows:
5. It is jointly agreed that the provisions of the Nursing Practice Act, including the provisions found at N.C. Gen.Stat. § 90-171.20(e) and (f), establish the scope of the practice of nursing by a registered nurse, and nothing contained in the rules of the Respondent at 21 N.C.A.C. 36.0226 in any way constitutes an expansion of such practice.
6. Respondent agrees to adopt as a final rule the revisions to 21 N.C.A.C. 36.0226 as proposed in the notice published in the North Carolina Register on August 15, 1994, and Petitioners agree not to challenge such revised rule under the North Carolina Administrative Procedure Act.
The consent order called for an amendment to rule .0226. The pre-amendment rule .0226, in pertinent part, reads as follows:
(b) Qualifications and Definitions:
(1) The registered nurse who completes a program accredited by the Council on Accreditation of Nurse Anesthesia Education Programs, is credentialed as a certified registered nurse anesthetist by the Council on Certification of Nurse Anesthetists, and who maintains recertification through the Council on Recertification of Nurse Anesthetists, may perform nurse anesthesia activities in collaboration with a physician, dentist, podiatrist, or other lawfully qualified health care provider.
The amendment to rule .0226 (as a consequence of the parties' settlement) retained all the language of the pre-amendment rule, but added the following:
(b) Qualifications and Definitions:

*725 (1) The registered nurse who completes a program accredited by the Council on Accreditation of Nurse Anesthesia Education Programs, is credentialed as a certified registered nurse anesthetist by the Council on Certification of Nurse Anesthetists, and who maintains recertification through the Council on Recertification of Nurse Anesthetists, may perform nurse anesthesia activities in collaboration with a physician, dentist, podiatrist, or other lawfully qualified health care provider, but may not prescribe a medical treatment regimen or make a medical diagnosis except under the supervision of a licensed physician.
(emphasis added)[3]. The effect of the amendment was to add the statutorily required *726 physician supervision language to the rule, while also leaving intact the collaboration language.
After execution of the 1994 consent order, the parties interpreted the consent order to mean different things. BON interpreted the consent order to mean acceptance by the Medical Board and the other petitioners that the activities described in rule .0226 do not involve the practice of medicine, and therefore, do not require physician supervision. The Medical Board and the other petitioners, however, interpreted the consent order as preserving the physician supervision requirement for those activities described in rule .0226 that involve the practice of medicine.
Subsequent to 1994, there has been no judicial determination or legislative clarification as to whether any of the described activities in rule .0226 constitute the practice of medicine, and thus require physician supervision. In December 1998, the North Carolina Attorney General (Attorney General) issued an advisory opinion on the following issue: "whether it is lawful for certified registered nurse anesthetists ("CRNAs") to provide anesthesia care without physician supervision[?]" The Attorney General responded that: "[f]or reasons which follow, it is our opinion that it is not. Anesthesia care largely constitutes diagnosis of, or prescription of medical treatment for a human ailment, thus constituting the practice of medicine under the Medical Practice Act, (Article 1, Chapter 90, of the N.C. General Statutes)." 1998 N.C.A.G. 58 (12/31/98). To date, it appears the December 1998 Attorney General opinion remains the only determination by an entity not associated with a party to the present litigation, that some of the activities described in rule .0226 constitute the practice of medicine.
In 2003, as a result of a great increase in the number of individuals receiving surgery in physicians' offices, the Medical Board adopted a position statement on office-based procedures (office-based anesthesia guideline). The position statement was the Medical Board's attempt to provide guidance to its licensees as to what might be considered acceptable standards of medical practice. The position statement covers such topics as credentialing, equipment maintenance, personnel, emergency procedures, infection control, performance improvement, informed consent, medical records, as well as the provision of anesthesia. While neither a statute nor a rule, the position statement was meant to serve as a guideline for physicians practicing surgery in their own offices.
On 1 May 2003, the Medical Board issued charges against Peter Loren Tucker, M.D. (Dr. Tucker) after an investigation stemming from an April 2001 incident. The Medical Board charged Dr. Tucker with practicing below minimum standards of medical practice when he failed to supervise his CRNA adequately. The facts involving the Tucker case were that a CRNA, employed by Dr. Tucker, had administered two cubic centimeters (cc's) of fentanyl, a highly potent analgesic, to a patient post-operatively after the patient received a mini-facelift performed by Dr. Tucker in his office. The CRNA did not possess prescribing privileges, yet she administered a schedule II controlled substance to the patient for her post-operative pain without authorization from Dr. Tucker. After the administration of the two cc's of fentanyl, the patient experienced respiratory *727 arrest and efforts were made to revive the patient in Dr. Tucker's office. The patient, a 45-year-old mother of two, died three days later in the hospital as a result of respiratory arrest brought about by the fentanyl injection.
The Medical Board referred its investigative material of the Tucker case to BON for appropriate action regarding the CRNA. On 6 August 2003, three months after the Medical Board issued public charges against Dr. Tucker and referred the case to BON for appropriate action, BON filed its motion to enforce the 1994 consent order, alleging, among other things, that:
Upon information and belief, in the nearly nine years since the parties' execution of the Consent Order, no investigation has been undertaken, nor has any other action been initiated or reported, by any Petitioner against any physician, surgeon, or CRNA on the grounds that such persons are practicing in conformity with the "collaboration" standard set forth in the [Rule .0226] rather than under the "supervision" standard that Petitioners now assert was required under the Consent Order.
Furthermore, at the 27 October hearing, counsel for BON made the following statement:
And, as we say in our motion, not once has the Medical Board, so far as we know, investigated a physician for suspicion of violating the supervision/collaboration issue. Not once have they investigated a nurse anesthetist. Not once have they brought anyone up on charges. There can be no more clear evidence of what the intent of the parties was back in 1994 than how they've lived that Consent Order for the ten years  nine years plus.
On 20 November 2003, the Medical Board and Dr. Tucker entered into a consent order resolving the charges against him.
The issues on appeal are whether the trial court erred by: (I) denying respondent's motion for enforcement of the consent order; (II) denying respondent's objections and motion to strike the submission of the consent order issued by the North Carolina Medical Board in the matter captioned In Re Peter Loren Tucker, M.D.; and (III) failing to rule on the pro hac vice motion for counsel for the American Society of Anesthesiology, and in considering the amicus brief tendered by counsel for the American Society of Anesthesiology.
As a preliminary matter, we note the following issues were not before this Court, and not before the trial court: (I) the statutory interpretation of rule .0226, and (II) precisely what nursing procedures must be completed under physician supervision versus those procedures completed in collaboration with a physician pursuant to the consent order. Accordingly, this Court will refrain from any interpretation of rule .0226. Further, this Court will not review what nursing procedures pursuant to rule .0226 must be completed under physician supervision versus in collaboration with a physician.

I
Respondent first argues the trial court erred in denying its motion for enforcement of the 1994 consent order.
A consent judgment is essentially a contract between parties, entered with the approval and sanction of the court, which creates a final determination of their rights and duties. See King v. King, 146 N.C.App. 442, 444, 552 S.E.2d 262, 264 (2001); Harborgate Prop. Owners Ass'n, Inc. v. Mountain Lake Shores Dev. Corp., 145 N.C.App. 290, 297, 551 S.E.2d 207, 212 (2001). It is basic contract law that a party is not entitled to specific performance arising under a contract unless the opposing party has breached its agreement pursuant to the contract. RGK, Inc. v. United States Fidelity & Guaranty Co., 292 N.C. 668, 675, 235 S.E.2d 234, 238 (1977) (stating that the complaint must allege the existence of a contract between the parties, the specific provisions breached, the facts constituting the breach, and the amount of damages resulting from the breach). If there is no breach, there can be no basis for relief. See id.
Moreover, as articulated by Arthur Corbin:
Specific performance will not be decreed unless the terms of the contract are so *728 definite and certain that the acts to be performed can be ascertained and the court can determine whether or not the performance rendered is in accord with the contractual duty assumed.
12 Arthur L. Corbin, Corbin on Contracts § 1174, at 335 (2002); see also Cummings v. Dosam, Inc., 273 N.C. 28, 33, 159 S.E.2d 513, 517 (1968) ("if the nature and extent of the intended restriction cannot be determined with reasonable certainty from the language of the covenant, it will not serve as the basis for the issuance of an injunction"); Munchak Corp. v. Caldwell, 46 N.C.App. 414, 419, 265 S.E.2d 654, 658 (1980) (holding that "[a] court of equity is not authorized to order the specific performance of a contract which is not certain, definite and clear, and so precise in all of its material terms that neither party can reasonably misunderstand it").
Petitioners argue that the only certain, definite, precise and clear behavior required of petitioners in the 1994 consent order is to refrain from challenging the revised rule .0226 under the Administrative Procedure Act (APA). It is undisputed that petitioners have not challenged the revised rule .0226 pursuant to the APA. Accordingly, petitioners argue that respondent's motion to enforce the consent order: (1) promotes an expansive interpretation of the 1994 consent order, and (2) asks the trial court to order specific performance of allegedly implied obligations.
Petitioners also argue that respondent's efforts, to expand the 1994 consent order to prohibit conduct not described therein and to inhibit the Medical Board from publishing guidelines for its licensees, have no basis in law or in fact. In addition, petitioners contend that because the remedy requested would have no effect on the ability of the Medical Board to enforce N.C. Gen.Stat. § 90-14.12, or to pursue criminal penalties pursuant to N.C. Gen.Stat. §§ 90-18(a) and 90-21, the alleged potential injury would not be eliminated by invalidation of the position statement. We will analyze the arguments below.
Respondent argues the trial court incorrectly construed revised rule .0226 and relevant statutes. However, the trial court was called upon to construe only the 1994 consent order. The relevant statutes and revised rule .0226 would only come under consideration to the extent that the 1994 consent order constituted a definitive agreement as to the construction of the statutes and revised rule .0226.
The relevant inquiry is, therefore, whether the 1994 consent order constitutes acquiescence by petitioners in the "collaboration standard" as argued by respondent. This Court is of the opinion that the consent order did not constitute acquiescence by petitioners to the collaboration standard. Petitioners initiated the 1993 action due to concerns that the proposed rule could be interpreted to allow CRNAs to administer anesthesia and prescribe medication without physician supervision, in violation of N.C. Gen.Stat. § 90-171.20(7)(e) and (f). The 1993 action was resolved after respondent agreed to add language to the proposed rule clarifying that the rule did not purport to allow CRNAs to prescribe a medical treatment or make a medical diagnosis except under the supervision of a licensed physician, and acknowledgment that the revised rule could not abridge the governing statutes.
The 1994 consent order does not purport to interpret the governing statutes, the proposed rule, or the revised rule. Petitioners argue if they had intended to acquiesce in a uniform collaboration standard, they would not have initiated the 1993 action or would have dismissed the action pursuant to Rule 41 of the North Carolina Rules of Civil Procedure. Instead, they obtained concessions from respondent in order to resolve the 1993 action, those being, incorporation of the governing statutes into the revised rule and acknowledgment that revised rule .0226 could not abridge the governing statutes. Further, paragraph 7 of the 1994 consent order, which specifically provides that the 1994 consent order shall not be construed as acquiescence of either party in the position of the other, defeats respondent's argument.
Petitioners' position on supervision of nursing personnel involved in anesthesia activities was set forth in the 19 November 1993 declaratory ruling regarding the scope and definition of the practice of medicine *729 pursuant to N.C. Gen.Stat. § 90-18. Respondent's position, that the 1994 consent order represents abandonment by the Medical Board of the physician supervision standard and a surrender to the collaboration standard, is inconsistent with and contradictory to the language of the 1994 consent order. The revised rule and the 1994 consent order must be read as requiring physician supervision for those nurse anesthetist activities which involve prescribing a medical treatment or making a medical diagnosis. Therefore, the position statement, which recommends that anesthesia in an office setting be administered by an anesthesiologist or a CRNA supervised by a physician, cannot be held to violate the 1994 consent order.
Respondent asserts that the three affidavits it submitted to the trial court compelled the conclusion that the Medical Board has acquiesced in the collaboration standard for a nine-year period. However, these affidavits fail to support such conclusion. The affidavits make no mention of what specific medical acts were performed under the collaboration standard, nor do the affiants specifically claim that the respondent's licensees were unsupervised. This lack of detail renders these affidavits ineffective as to the issue of acquiescence in the collaboration standard.
Therefore, we cannot agree with respondent's assertion that the affidavits compel a conclusion that the Medical Board abandoned the standard of care  supervision of medical acts performed by nurse anesthetists. Furthermore, petitioners submitted to the trial court the consent order issued by the Medical Board in the matter captioned In Re Peter Loren Tucker, M.D. as an example of the Medical Board's enforcement of the supervision standard.
Physician supervision of nurse anesthetists providing anesthesia care, when that care includes prescribing medical treatment regimens and making medical diagnoses, is a fundamental patient safety standard required by North Carolina law. See N.C.G.S. § 90-18(b) (2003); N.C.G.S. § 90-171.20(7)(e). Neither the 1994 consent order nor the position statement changed the statutory requirement of when physician supervision is necessary.
Respondent asserts the Medical Board must follow the 1994 consent order regardless of whether the 1994 consent order could be read to impede its obligation to regulate the activities of its licensee physicians. However, even assuming the 1994 consent order could be read as evidencing an intent by the Medical Board to acquiesce in a collaboration standard, the Medical Board cannot be forbidden from advising its licensees on the standard of care in medical practice in order to protect the public interest. See Gaddis v. Cherokee County Road Comm., 195 N.C. 107, 111, 141 S.E. 358, 360 (1928) ("Administrative boards, exercising public functions, cannot by contract deprive themselves of the right to exercise the discretion delegated by law, in the performance of public duties."). The Medical Board, as an administrative board established pursuant to N.C. Gen.Stat. § 90-2, cannot be estopped from exercising its duty to regulate the practice of medicine in the interest of the public.
Moreover, a state agency is prohibited from adopting a rule that enlarges the scope of a profession, occupation, or field of endeavor for which an occupational license is required. N.C.G.S. § 150B-19(2) (2003); see also In re Trulove, 54 N.C.App. 218, 221, 282 S.E.2d 544 (1981) ("Administrative regulations must be drafted to comply with statutory grants of power and not vice versa."). Accordingly, this assignment of error is overruled.

II
Respondent next argues that the trial court erred in denying its objection and motion to strike the submission of, and in admitting, considering, and basing its order on the consent order issued by the Medical Board in the matter captioned In Re Peter Loren Tucker, M.D., or any related material.
At the hearing on the motion to enforce, respondent asserted that the Medical Board had never prosecuted a physician for violating the supervision standard. In direct response to this assertion, counsel for the Medical Board offered to the trial court that the Medical Board was, in fact, currently prosecuting a physician for just such a violation. *730 Respondent made no objection to this testimony by counsel for the Medical Board.
After the hearing, petitioners filed both a supplemental brief and a copy of the consent order in the Tucker matter. The provision of these supplemental materials was in full compliance with the trial court's express authorization of submission of additional briefing or other clarifying materials to which respondent made no objection.
Accordingly, because respondent failed to object to the trial court's authorization of the filing of supplemental materials, appeal on this issue has been waived. N.C. R.App. P. 10(b)(l).
In addition, this Court has previously held:
The mere admission by the trial court of incompetent evidence over proper objection does not require reversal on appeal. Rather, the appellant must also show that the incompetent evidence caused some prejudice. In the context of a bench trial, an appellant must show that the court relied on the incompetent evidence in making its [determination]. Where there is competent evidence in the record supporting the court's [determination], we presume that the court relied upon it and disregarded the incompetent evidence.
In re Morales, 159 N.C.App. 429, 433, 583 S.E.2d 692, 695 (2003); see also In re Spivey, 345 N.C. 404, 417, 480 S.E.2d 693, 700 (1997) ("Where, as here, the trial judge acted as the finder of fact, it is presumed that he disregarded any inadmissible evidence that was admitted and based his judgment solely on the admissible evidence that was before him."); Bizzell v. Bizzell, 247 N.C. 590, 604, 101 S.E.2d 668, 678 (1958) ("where a case has been tried before the court without a jury the admission of incompetent evidence is ordinarily deemed to have been harmless unless it affirmatively appears that the action of the court was influenced thereby. In other words it is presumed that incompetent evidence was disregarded by the court in making up its decision.") (citation omitted) (internal quotations omitted).
The order from which respondent appeals, reads in its entirety:
This cause coming on to be heard and being heard out of the presence of any jurors on Respondent's Motion for Enforcement of Consent Order and the Court having heard arguments, having reviewed all matters filed in this matter, having considered all briefs, memoranda and documents submitted to it, and having considered all relevant and applicable law, now orders that Respondent's Motion for Enforcement of Consent Order be, and the same hereby is, DENIED.
Here, respondents failed to object to the admission of the evidence before the trial court, and further failed to meet its burden of proving that the trial court relied upon this alleged incompetent evidence in making its determination. This assignment of error is overruled.

III
Respondent lastly argues that the trial court erred in failing to rule on, or in implicitly overruling respondent's objection to, the pro hac vice motion for counsel for the American Society of Anesthesiology, and in considering the amicus brief tendered by counsel for the American Society of Anesthesiology.
As stated supra Issue II, the appellant (BON) has an affirmative duty to "show that the incompetent evidence caused some prejudice. In the context of a bench trial, an appellant must show that the court relied on the incompetent [or inadmissible] evidence in making its [determination]." Morales, 159 N.C.App. at 433, 583 S.E.2d at 695; see also Spivey, 345 N.C. at 417, 480 S.E.2d at 700; Bizzell, 247 N.C. at 604, 101 S.E.2d at 678. Without an affirmative showing that the trial court relied on this allegedly inadmissible evidence in rendering its decision, this assignment of error is overruled.

Conclusion
It appears petitioners have not violated the 1994 consent order as the consent order is too vague to support specific performance, and further, respondent's potential injury is speculative and would not be cured by the remedy requested. In addition, the consent order cannot be construed as petitioners' acquiescence *731 in respondent's position on collaboration.
Affirmed.
Judges HUNTER and JACKSON concur.
NOTES
[1] "Collaborating with other health care providers in determining the appropriate health care for a patient but, subject to the provisions of G.S. 90-18.2, not prescribing a medical treatment regimen or making a medical diagnosis, except under supervision of a licensed physician." N.C.G.S. § 90-171.20(7)(e) (2003).
[2] "Implementing the treatment and pharmaceutical regimen prescribed by any person authorized by State law to prescribe the regimen." N.C.G.S. § 90-171.20(7)(f) (2003).
[3] Rule .0226, as adopted, reads in its entirety:

(a) Only those registered nurses who meet the qualifications as outlined in Paragraph (b) of this Rule may perform nurse anesthesia activities outlined in Paragraph (c) of this Rule.
(b) Qualifications and Definitions:
(1) The registered nurse who completes a program accredited by the Council on Accreditation of Nurse Anesthesia Educational Programs, is credentialed as a certified registered nurse anesthetist by the Council on Certification of Nurse Anesthetists, and who maintains recertification through the Council on Recertification of Nurse Anesthetists, may perform nurse anesthesia activities in collaboration with a physician, dentist, podiatrist, or other lawfully qualified health care provider, but may not prescribe a medical treatment regimen or make a medical diagnosis except under the supervision of a licensed physician.
(2) The graduate nurse anesthetist is a registered nurse who has completed a program accredited by the Council on Accreditation of Nurse Anesthesia Educational Programs, is awaiting initial certification by the Council on Certification of Nurse Anesthetists and is listed as such with the Board of Nursing. The graduate nurse anesthetist may perform nurse anesthesia activities under the supervision of a certified registered nurse anesthetist, physician, dentist, podiatrist, or other lawfully qualified health care provider provided that initial certification is obtained within 18 months after completion of an accredited nurse anesthesia program.
(3) Collaboration is a process by which the certified registered nurse anesthetist or graduate nurse anesthetist works with one or more qualified health care providers, each contributing his or her respective area of expertise consistent with the appropriate occupational licensure laws of the State and according to the established policies, procedures, practices and channels of communication which lend support to nurse anesthesia services and which define the role(s) and responsibilities of the qualified nurse anesthetist within the practice setting. The individual nurse anesthetist maintains accountability for the outcome of his or her actions.
(c) Nurse Anesthesia activities and responsibilities which the appropriately qualified registered nurse anesthetist may safely accept are dependent upon the individual's knowledge and skills and other variables in each practice setting as outlined in 21 NCAC 36 .0224(a). These activities include:
(1) Preanesthesia preparation and evaluation of the client to include:
(A) performing a pre-operative health assessment;
(B) recommending, requesting and evaluating pertinent diagnostic studies; and
(C) selecting and administering preanesthetic medications.
(2) Anesthesia induction, maintenance and emergence of the client to include:
(A) securing, preparing and providing basic safety checks on all equipment, monitors, supplies and pharmaceutical agents used for the administration of anesthesia;
(B) selecting, implementing, and managing general anesthesia, monitored anesthesia care, and regional anesthesia modalities, including administering anesthetic and related pharmaceutical agents, consistent with the client's needs and procedural requirements;
(C) performing tracheal intubation, extubation and providing mechanical ventilation;
(D) providing perianesthetic invasive and non-invasive monitoring, recognizing abnormal findings, implementing corrective action, and requesting consultation with appropriately qualified health care providers as necessary;
(E) managing the client's fluid, blood, electrolyte and acid-base balance; and
(F) evaluating the client's response during emergency from anesthesia and implementing pharmaceutical and supportive treatment to ensure the adequacy of client recovery from anesthesia.
(3) Postanesthesia Care of the client to include:
(A) providing postanesthesia follow-up care, including evaluating the client's response to anesthesia, recognizing potential anesthetic complications, implementing corrective actions, and requesting consultation with appropriately qualified health care professionals as necessary;
(B) initiating and administering respiratory support to ensure adequate ventilation and oxygenation in the immediate postanesthesia period;
(C) initiating and administering pharmacological or fluid support of the cardiovascular system during the immediate postanesthesia period;
(D) documenting all aspects of nurse anesthesia care and reporting the client's status, perianesthetic course, and anticipated problems to an appropriately qualified postanesthetic health care provider who assumes the client's care following anesthesia consistent with 21 NCAC 36 .0224(f); and
(E) releasing clients from the postanesthesia care or surgical setting as per established agency policy.
(d) Other clinical activities for which the qualified registered nurse anesthetist may accept responsibility include, but are not limited to:
(1) inserting central vascular access catheters and epidural catheters;
(2) identifying, responding to and managing emergency situations, including initiating and participating in cardiopulmonary resuscitation;
(3) providing consultation related to respiratory and ventilatory care and implementing such care according to established policies within the practice setting; and
(4) initiating and managing pain relief therapy utilizing pharmaceutical agents, regional anesthetic techniques and other accepted pain relief modalities according to established policies and protocols within the practice setting.
21 N.C.A.C. 36.0226 (2003).