Howard v. IOMAXIS, LLC, 2022 NCBC 76.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

KELLY C. HOWARD and FIFTH
THIRD BANK, NATIONAL
ASSOCIATION, AS CO-TRUSTEES
OF THE RONALD E. HOWARD
REVOCABLE TRUST U/A DATED
FEBRUARY 9, 2016, AS AMENDED
AND RESTATED,

        Plaintiffs,

    v.

IOMAXIS, LLC; BRAD C. BOOR a/k/a
BRAD C. BUHR; JOHN SPADE, JR.;
WILLIAM P. GRIFFIN, III;
NICHOLAS HURYSH, JR.; and
ROBERT A. BURLESON,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 11679

**ORDER AND OPINION ON IOMAXIS
DEFENDANTS' CONSOLIDATED
MOTION TO DISMISS THE TRUST'S
FIRST AMENDED COMPLAINT**

1.    **THIS MATTER** is before the Court on the IOMAXIS Defendants'[1] Consolidated Motion to Dismiss the Trust's First Amended Complaint ("Motion"), (ECF No. 223), pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the Rule(s)).

2.    Before his death, Ronald E. Howard owned a 51% interest in IOMAXIS, LLC ("IOMAXIS" or "the Company"). The interest passed to his Estate at the time of his death in June 2017 before being transferred to a trust in December 2017.

---

[1] The Court refers to IOMAXIS, LLC, Brad C. Boor a/k/a Brad C. Buhr, John Spade, Jr., William P. Griffin, III, and Robert A. Burleson collectively as the "IOMAXIS Defendants" to distinguish them from Nicholas Hurysh, Jr. ("Hurysh") who is also a defendant. IOMAXIS, LLC, the entity, is referred to as "IOMAXIS."

Plaintiffs are co-trustees of the trust, and this case arises from a dispute regarding the rights of the trust with respect to its interest in IOMAXIS. Defendants are IOMAXIS and individuals with an interest in IOMAXIS that may be affected by this action.

3. Having considered the Motion, the related briefing, and the arguments of counsel at a hearing on the Motion, the Court hereby **GRANTS** in part, **DENIES** in part, and **STAYS** in part the Motion.

> *Johnston, Allison & Hord, P.A., by Greg C. Ahlum, Parker E. Moore,[2] David T. Lewis, and Lauren S. Martin, for Plaintiff Kelly Howard, as co-Trustee of the Ronald E. Howard Revocable Trust u/a dated February 9, 2016, as Amended and Restated.*

> *Womble Bond Dickinson (US) LLP, by Lawrence A. Moye, and Loper Law, PLLC, by Johnny M. Loper, for Plaintiff Fifth-Third Bank, NA, as co-Trustee of the Ronald E. Howard Revocable Trust u/a dated February 9, 2016, as Amended and Restated.*

> *Allen, Chesson & Grimes PLLC, by David Allen, Benjamin S. Chesson, and Anna Majestro, and Nelson Mullins Riley & Scarborough LLP, by Travis Bustamante, for Defendants IOMAXIS, LLC, Brad C. Boor a/k/a Brad C. Buhr, John Spade, Jr., William P. Griffin, III, and Robert A. Burleson.*

> *Miller Monroe & Plyer, PLLC, by Jason A. Miller, Paul T. Flick, and Robert B. Rader, III, for Defendant Nicholas Hurysh.*

Earp, Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

4. The Court does not make findings of fact on a Motion to Dismiss under Rule 12(b)(6). The following factual summary is drawn from the allegations in

---

[2] Since the time of the Motion hearing, Parker E. Moore has withdrawn from this matter, and Patrick E. Kelly and Kathleen D. B. Burchette have appeared as additional counsel for Kelly C. Howard, co-trustee of the Ronald E. Howard Revocable Trust.

the First Amended Complaint ("Am. Compl."), (ECF Nos. 3, 197)[3], including its attached exhibits.

5.     Plaintiffs allege that IOMAXIS, LLC ("IOMAXIS") is a North Carolina limited liability company.  (Am. Compl. ¶ 8.)

6.     Ronald Howard ("Decedent") died on 12 June 2017.  At the time of his death, Decedent held a 51% membership interest in IOMAXIS.  The interest passed to his Estate.  (Am. Compl. ¶¶ 1, 3, 4.)

7.     On 8 December 2017, the Estate transferred all of its interest in IOMAXIS to the Ronald E. Howard Revocable Trust ("Trust").  (Am. Compl. ¶ 5.)

8.     IOMAXIS has an Operating Agreement[4] that restricts the ability of a member to transfer, voluntarily or involuntarily, all or any part of the member's interest in the Company without the prior written consent of a "Majority in Interest" of the "Disinterested Members."[5]  (OA § 8.1, Compl. Ex. C, ECF No. 3.)[6]

---

[3] The Amended Complaint, (ECF No. 197), incorporates the entirety of the initial Complaint, (ECF No. 3).

[4] Plaintiffs allege that an attempt to convert IOMAXIS from a North Carolina LLC to a Texas LLC was unsuccessful, and they seek a declaratory judgment establishing that IOMAXIS is a North Carolina LLC, that it is controlled by an operating agreement entered by its members on 26 November 2001 (the "Operating Agreement"), and that a later operating agreement (the "Texas Document") is not controlling.  For purposes of this Order and Opinion, the Court accepts as true Plaintiffs' allegations that the Operating Agreement is controlling.

[5] A "Majority in Interest" is defined as "a combination of any Members who, in the aggregate, own more than fifty percent (50%) of the Membership Interests of all Members."  A "Disinterested Member" is one "who is not related . . . to either the Member whose Membership Interest is to be transferred as provided in Article VIII or the proposed transferee of such Membership Interest."  (OA § 1.1.)

[6] The Operating Agreement is divided into Articles, and each Article contains multiple subparts.  The Operating Agreement refers to the subparts as "sections" and numbers them

9.	However, the death of a member triggers several other provisions of the Operating Agreement.  First, Section 4.6 provides:

> ***Bankruptcy or Incapacity of a Member****.*  A Member shall cease to have any power as a Member or a Manager, any voting rights or rights of approval hereunder upon death . . . ; and each Member, its personal representative, **estate,** or successor . . . **shall have only the rights, powers, and privileges of a transferee enumerated in Section 8.4[.]**

(OA § 4.6, emphasis added.)

10.	Section 8.4 defines the rights of a transferee as:

> ***Rights of Transferee****.*  Unless admitted to the Company in accordance with Section 8.3, the transferee of a Membership Interest or a part thereof **shall not be entitled to any of the rights, powers, or privileges of its predecessor in interest, except** that such transferee shall be entitled to receive and be credited or debited with its **proportionate share of Profits, Losses, Gains from Capital Transactions, Company Cash Flow, Company Sales Proceeds, Company Refinancing Proceeds, and Distributions in liquidation**.

(OA § 8.4, emphasis added.)

11.	Second, the death of a member activates the Buy-Sell provisions in Article IX of the Operating Agreement.  (Am. Compl. ¶ 51, OA § 9.1 *et seq*.)  Section 9.2 states that the executor "shall give notice of the [death] (the 'Buy-Sell Notice') to the other Members within ten (10) days after its occurrence."  (OA § 9.2.)  Section 9.3 provides that upon the occurrence of the death, each of the remaining Members "shall have an option to purchase (the "Purchase Option") the [Decedent's] Membership Interest at Closing on the terms and conditions set forth in this Article IX . . . . The

according to their Article.  For example, Article IV, Section 1.6 is referenced as "Section 4.6." The Court adopts this numbering convention in this Order and Opinion.

Purchasing Members must give notice of their election to exercise their Purchase Option to the [executor] and all other Members within thirty (30) days following delivery of the Buy-Sell Notice." (OA § 9.3.)

12. The Operating Agreement's provision for valuing an interest subject to the Buy-Sell provisions is Section 9.5. That section was amended in November 2004 to read:

> **Agreement on Valuation.** The [Estate] shall offer to sell its interest to the remaining Members . . . . The value of such interest shall be agreed upon by the [Estate] and the remaining Members. If the [Estate] and the remaining Members cannot agree on such price, then the [Estate] shall deliver his/her offer in writing to the remaining Members, to which the remaining Members must return a written notice of rejection or acceptance within a period of ten (10) days of receipt of said written offer. If said offer is rejected, the [Estate] must purchase the remaining Members' interests at the price of [the Estate's] written offer. If said offer is accepted, the remaining Members must purchase the [Estate's] interest.

(First Amendment to OA § 9.5, Compl. Ex. F, ECF No. 3.)

13. There is a time limit on post-death transfers under the Buy-Sell provisions. The "closing" of the purchase of any interest pursuant to the Buy-Sell provisions "shall take place on the date agreed upon by the purchaser(s) and seller, but not later than ninety (90) days after the [death]." (OA § 9.6.)

14. Furthermore, "upon the exercise of the Purchase Option, the [Estate] . . . will have no rights in the Company or against the Company, any Member, or any Manager other than the right to receive payment for its Membership interest[.]" (OA § 9.8.)

15. However, in the event the Members do not exercise their Purchase Option, Section 9.9 of the Operating Agreement provides:

> ***Failure to Exercise Purchase Option*** **. . . . [The Executor] may transfer [the Estate's] economic rights in the Membership Interest of the [Decedent] to any Person;** PROVIDED, HOWEVER, that any transferee of the [Decedent's] Membership Interest, as provided herein, (i) shall only have those rights as specified in Section 8.4, (ii) shall not be admitted as a substitute Member without full compliance with Section 8.3, and (iii) shall be subject to the Buy-Sell restrictions imposed under this Article IX.

(OA § 9.9, emphasis added.)

16. Finally, Section 11.8 of the Operating Agreement provides:

> ***Survival of Rights.*** Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.

(OA § 11.8.)

17. Following Decedent's death, his executor, K.C. Howard, requested that IOMAXIS and its manager, Brad Buhr ("Buhr"), "provide information necessary to complete and file an estate tax return with the Internal Revenue Service, [and to] determine the fair value of [Decedent's] interest and the Estate's interest in IOMAXIS," among other things. (Am. Compl. ¶ 53.)

18. The Estate, IOMAXIS, and Buhr agreed to hire an appraiser. (Am. Compl. ¶ 56.) The Estate consented to using RSM US LLP ("RSM"), the appraisal firm requested by IOMAXIS and Buhr. RSM was then retained. (Am. Compl. ¶¶ 57–58.)

19. Plaintiffs allege, however, that IOMAXIS and Buhr refused to provide RSM "the information necessary to conduct a fair market value appraisal" of the

Estate's interest in IOMAXIS. (Am. Compl. ¶ 59.) Instead, IOMAXIS and Buhr notified the Estate that they intended to have a valuation of IOMAXIS performed by another company, Valuation Services, Inc. (Am. Compl. ¶ 60.)

20. The Estate informed IOMAXIS and Buhr that for the Internal Revenue Service ("IRS") to recognize the validity of the appraisal, the Estate had to retain the appraisal firm, and it urged IOMAXIS and Buhr to cooperate with RSM. However, IOMAXIS and Buhr allegedly did not respond to the Estate. (Am. Compl. ¶¶ 61–62.)

21. To date, Plaintiffs allege, IOMAXIS and Buhr have not provided Plaintiffs with "all of the requested information from which the business, financial condition and the valuation of IOMAXIS may be ascertained." (Am. Compl. ¶ 68.)

22. In addition, IOMAXIS has allegedly made disbursements to other Members after Decedent's death on 12 June 2017, but it has made no payments to either the Estate or the Trust. (Am. Compl. ¶¶ 69, 81–83.)

23. Plaintiffs' Amended Complaint asserts a claim for declaratory judgment with respect to whether IOMAXIS is a North Carolina limited liability company or a Texas limited liability company, which operating agreement controls, and Plaintiffs' entitlement to distributions. Plaintiffs also assert a claim for breach of the right to receive interim distributions since 12 June 2017. They claim that they require an accounting to obtain the "business, financial and valuation information" that they contend is necessary to be able to discharge their duties to the Trust's beneficiaries, for the Estate to file its tax return, and to facilitate compliance with the applicable Buy-Sell provisions in the Operating Agreement. (Am. Compl. ¶¶ 71–97.)

24.    In support of their demand for an accounting, Plaintiffs assert that IOMAXIS and Buhr, its manager, "have a duty and obligation to act in good faith and fair dealing." (Am. Compl. ¶ 96.)

25.    In turn, the IOMAXIS Defendants seek an order:  (1) dismissing the Trust's claims in their entirety because Plaintiffs have failed to allege that the Trust holds a valid interest that affords it standing; (2) denying Plaintiffs' request that the Court enter an Order specifically enforcing the Buy-Sell provisions contained in the Operating Agreement; (3) dismissing any claims for personal liability against any individual defendant; and (4) denying the request for an accounting.  (IOMAXIS Defs' Br. Supp. Consol. Mot. Dismiss ["Defs' Br."] 7–11, ECF No. 224.)[7]

## II.    LEGAL STANDARD

26.    "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cty.,* 355 N.C. 161, 166 (2002)).  This standard of review for Rule 12(b)(6) is the standard our Supreme Court "routinely uses . . . in assessing the sufficiency of

---

[7] The IOMAXIS Defendants consolidated their motion to dismiss for failure to state a claim with Burleson's separate motion to dismiss for lack of personal jurisdiction.  The Court has stayed a determination of Burleson's motion, as well as further proceedings with respect to Plaintiffs' Fourth and Fifth claims for relief (fraud and violation of the Uniform Voidable Transactions Act) and their demands for a constructive trust and punitive damages.  (*See* Order on Motion to Sever and Stay, ECF No. 283.)  Consequently, only the claims asserted by Plaintiffs in the initial complaint—for declaratory judgment, for breach of right to interim distributions, and for an accounting—are addressed herein.

complaints in the context of complex commercial litigation." *Id*. at 615 n.7 (citations omitted).

27. When conducting its review, the Court's inquiry is "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987). And, although the Court accepts all well-pleaded factual allegations in the relevant pleading as true, see *Krawiec v. Manly*, 370 N.C. 602, 606 (2018), the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.,* 174 N.C. App. 266, 274 (2005) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)).

28. Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC.*, 251 N.C. App. 198, 206 (2016) (quoting *Laster v. Francis*, 199 N.C. App. 572, 577 (2009)). The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id*. at 206.

### III.    ANALYSIS

A. Standing

29. The IOMAXIS Defendants first argue that the Estate's assignment of its economic interest to the Trust was attempted without the prior written consent of a "Majority in Interest" of the "Disinterested Members" as required by Section 8.1 of

the Operating Agreement. Consequently, they argue, no such assignment could have occurred. In addition, the IOMAXIS Defendants contend that the Trust's failure to allege with specificity the amount of its interest or that the Estate met the conditions required for a valid transfer prevent the Trust from establishing that it has standing to bring this action. (Defs' Br. 7–9.)

30. Plaintiffs, on behalf of the Trust, respond that the Amended Complaint clearly identifies an interest in IOMAXIS that was assigned to and is currently held by the Trust. They argue that, at this juncture, Rule 8 does not require them to plead additional specifics regarding the amount of its interest or the conditions that led to its transfer. (Pls' Br. Opp. IOMAXIS Defs' Consol. Mot. Dismiss, ["Pls' Br."] 5–6, ECF No. 235.) As for the prior written consent requirement in Section 8.1 of the Operating Agreement, Plaintiffs respond that the provision only applies when the transferor is a member, and it does not apply when the interest is held by an economic interest holder such as the Estate. (Pls' Br. 6–7.)

31. The Court observes that the Amended Complaint alleges that Decedent's interest passed to his Estate, which, in turn, passed all that the Estate held to the Trust. (Am. Compl. ¶ 5, Ex A.) There is no allegation that the interest was diminished either before or since its assignment to the Trust.

32. Furthermore, Article IX sets out the Buy-Sell procedure triggered by the death of a member, and (absent breach of the agreement) it is that procedure, rather than the more general procedures stated in Section 8.1, that governs the transfer of

the deceased member's interest.[8] However, the transferee receives only the economic rights specified in Section 8.4, and the transferee "shall be subject to the Buy-Sell restrictions imposed under the Article IX."

33. Notably, although Section 9.9 references other provisions from Article VIII, nowhere does it reference Section 8.1 or otherwise state that a transfer pursuant to Article IX must be approved in writing by a Majority in Interest of the Disinterested Members. Therefore, the Court concludes that Ron Howard's death triggered the procedures specified in Article IX with respect to his economic rights, and no additional written consent of the members was required for the transfer.

34. With respect to whether Plaintiffs have sufficiently pled the mechanics of the transfer from the Estate to the Trust to establish standing, the Court determines for the following reasons that the allegations are minimally sufficient.

35. It is clear on the face of the Amended Complaint that the Buy-Sell process did not result in a transfer of the Estate's interest to any of the remaining members of IOMAXIS. Instead, Plaintiffs allege that the Estate transferred all of its interest in IOMAXIS to the Trust.

36. What is not clear on the face of the Amended Complaint is *how* the transfer occurred. But there are a limited number of possible avenues, two that require consideration of the members' option to purchase, and one that does not.

---

[8] Plaintiffs argue that once deceased, a former member is no longer a member subject to the "written consent" requirement in Section 8.1. Even if that were not true, the Court determines that the members' inclusion of the specific procedures in Article IX of the Operating Agreement reflects their written consent for those procedures to govern transfers of a deceased member's "record or beneficial interest in the Company" and satisfies the "written consent" requirement of Section 8.1.

37. The first scenario is that the remaining members <u>did not</u> exercise their option to purchase the interest, in which case Section 9.9 permitted a transfer to "any Person," including the Trust. As transferee, the Trust "shall be subject to the Buy-Sell restrictions imposed under this Article IX." (OA § 9.9.)

38. A second scenario is that one or more of the remaining members <u>did</u> opt to purchase the interest, but the process stalled because the Estate could not formulate an offer. Plaintiffs allege that this is because IOMAXIS and Buhr, its manager, did not provide the financial information the Estate claims was necessary for the Estate (and now the Trust) to do so.

39. The inability to formulate an informed offer could have serious ramifications for the Estate. Section 9.5 requires the Estate to deliver an offer in writing to the remaining members, who have ten days to accept or reject it. If the offer is rejected, the Estate *must* purchase the remaining members' interests at the price of its written offer. Plainly, then, the Estate is incented to value its interest fairly and accurately, something it alleges it was prevented from doing as a result of IOMAXIS' refusal to provide requested financial information. However, the IOMAXIS Defendants argue that no express provision in the Operating Agreement requires them to provide an economic interest holder financial information, even if that information is to value the interest.

40. The IOMAXIS Defendants are correct that no such express term exists in the Operating Agreement. But in addition to its express terms, "[u]nder North Carolina law, every contract contains an implied covenant of good faith and fair

dealing that neither party will do anything which injures the rights of the other to receive the benefits of the agreement." *Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 38 (2018) (internal marks and citation omitted). This implied covenant is a "basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." *Maglione v. Aegis Family Health Ctrs.*, 168 N.C. App. 49, 56 (2005) (quoting *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 40 N.C. App. 743, 746 (1979)). It has been called the "spirit of the contract." *Bicycle Transit Authority, Inc. v. Bell*, 314 N.C. 219, 230 (1985) (defendant breached both the "letter and the spirit of the contract"); *accord Allen v. Allen*, 61 N.C. App. 716, 720 (1983) (party's actions were "clear violations of both the letter and spirit of the contract").

41. The implied covenant of good faith and fair dealing is the gap-filler that guides the parties in their performance of the express terms of the contract. Its central purpose is "to allow enforcement of a vague or incomplete agreement that the ratifying parties intended to be binding, but that lacks certain terms essential to proper contract formation." *Rezapour v. Earthlog Equity Group, Inc.*, 2013 U.S. Dist. LEXIS 92124, at *11 (W.D.N.C. July 1, 2013) (citing *Ultra Innovations, Inc. v. Food Lion, Inc.*, 130 N.C. App. 315, 317–18 (1998)).

42. Although invisible on the page, the implied covenant of good faith and fair dealing is an essential component of a contract. It is the foundation upon which the agreement is built. It is a material term. *See Weyerhaeuser Co.*, 40 N.C. App. at 746 ("Good faith and fair dealing are required of all parties to a contract; and each

party to a contract has the duty to do everything that the contract presupposes that he will do to accomplish its purpose." (citing 17A C.J.S. Contracts § 451, at 564 (1963))).[9]

43.     Accordingly, if the covenant of good faith and fair dealing was violated by IOMAXIS and Buhr's alleged refusal to provide information necessary to value the Decedent's interest, a material breach occurred,[10] and the anti-assignment provision in Section 8.1 of the Operating Agreement (prohibiting transfers without the "prior written consent of a Majority in Interest of the Disinterested Members") would no longer control.  (OA § 8.1.)  *See, e.g., Millis Constr. Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App. 506, 512 (1987) ("The general rule governing bilateral contracts requires that if either party commits a material breach of the contract, the other party should be excused from the obligation to further perform.").  In that event, the Estate would be free to transfer its interest to the Trust without consent of the members.

44.     The third scenario doesn't depend on the Members' option at all. Amended Section 9.5 requires the Estate to initiate the Buy-Sell by naming its price, without any mention of the option ("The withdrawing Member shall offer to sell its

---

[9] After complaining that they, too, have been deprived of necessary information, Plaintiffs reference the duty of good faith and fair dealing in their Third Claim for Relief:  "Defendants IOMAXIS and Buhr have a duty and obligation to act in good faith and fair dealing with regard to Plaintiffs and their requests for the business, financial and valuation information necessary for the buy-sell event under the Operating Agreement and in order to file an accurate estate tax return."  (Am. Compl. ¶ 96.)

[10] Implied covenant claims need not be paired with a breach of the express provisions of a contract to be actionable in North Carolina.  *See, e.g., Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531, 556 (2007); *TAC Invs., LLC v. Rodgers*, 2020 NCBC LEXIS 143, at **15 (N.C. Super. Ct. Dec. 7, 2020); *Vitaform, Inc. v. Aeroflow, Inc.*, 2020 NCBC LEXIS 132, at *13 (N.C. Super. Ct. Nov. 4, 2020).

interest to the remaining Members[.]"). As with the second scenario above, if the Estate was stymied by its inability to get the financial information necessary to make its offer and the spirit of the agreement was violated, the Estate would be relieved of restrictions on a transfer to the Trust.

45.     Considering the totality of the allegations in the Amended Complaint and the standard upon which the Court conducts its review for Rule 12(b)(6) purposes, the Court determines that the allegations presented in the Amended Complaint are sufficient to establish that the Trust has standing. While it is true that the allegations as to which scenario led to the transfer are not made explicit, in any of the three possible scenarios described above, the Trust becomes a transferee of an interest in IOMAXIS, giving it standing. *See Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156 (1986) (the facts and permissible inferences set forth in the Amended Complaint are to be treated in a light most favorable to the nonmoving party); *Pyco Supply Co., Inc. v. Am. Centennial Ins. Co.*, 321 N.C. 435, 443 (1988) (denying a party his day in court because of his "imprecision with the pen" would "elevate form over substance" and run "contrary to the purpose and intent of notice pleading and the modern rules of civil procedure").

B.     Specific Performance of the Buy-Sell

46.     The IOMAXIS Defendants next argue that Plaintiffs have not alleged a claim on behalf of the Trust that would support their request for an order enforcing the Buy-Sell provisions of the Operating Agreement. Specifically, the IOMAXIS Defendants argue: (a) that the Trust has not alleged a breach of the Buy-Sell

provisions; (b) that the Trust has not alleged "definite and certain" obligations that the Buy-Sell provisions impose on any of the IOMAXIS Defendants that could be the subject of an order; and (c) harkening to its first argument, that the Trust has no contractual right to compel the members to opt to purchase, thereby triggering the Buy-Sell provisions. (Defs' Br. 9–10.)

47. Plaintiffs respond that they have alleged a breach of the Buy-Sell provisions in the Operating Agreement, as evidenced by the fact that the Decedent's interest has not been redeemed, and the appraisal process has not been followed.[11]

48. "The remedy of specific performance is available to compel a party to do precisely what he ought to have done without being coerced by the court." *Munchak Corp. v. Caldwell*, 301 N.C. 689, 694 (1981) (internal quotation marks omitted). "To receive specific performance, the law requires the moving party to prove that (i) the remedy at law is inadequate, (ii) the obligor can perform, and (iii) the obligee has performed [her] obligations." *Reeder v. Carter*, 226 N.C. App. 270, 275 (2013) (cleaned up). Damages must be inadequate. *See Whalehead Properties v. Coastland Corp.*, 299 N.C. 270, 282 (1980).

49. Generally, "specific performance of a contract is decreed only when it is equitable to do so." *Hutchins v. Honeycutt*, 286 N.C. 314, 318 (1974). "The party claiming the right to specific performance must show the existence of a valid contract, its terms, and either full performance on his part or that he is ready, willing and able

---

[11] Plaintiffs refer to Section 9.6 of the Operating Agreement, but that provision deals with the closing of any purchase, not the value of the interest. The valuation provision is Section 9.5. (*Compare* OA § 9.5, *with* OA § 9.6.) That provision was amended in 2004 and no longer requires the appraisal process described by Plaintiffs in their brief. (*See* Am. Compl. Ex. F.)

to perform." *Munchak*, 301 N.C. at 694 (citing 71 Am. Jur. 2d "Specific Performance," § 207 (1973)). "Specific performance will not be decreed unless the terms of the contract are so definite and certain that the acts to be performed can be ascertained and the court can determine whether or not the performance rendered is in accord with the contractual duty assumed." *N.C. Med. Soc'y v. N.C. Bd. of Nursing*, 169 N.C. App. 1, 12 (2005) (quoting 12 Arthur L. Corbin, *Corbin on Contracts* § 1174, at 335 (2002)).

50.     Here, the Court agrees with the IOMAXIS Defendants that Plaintiffs cannot force the members to exercise the purchase option that was available to them pursuant to Article IX following Decedent's death. However, as discussed above, the amended Section 9.5 does not *require* such an election as a precondition to the valuation process. Indeed, Section 9.5 *mandates* that the Estate "shall" offer to sell its interest to the "*remaining* Members" without referencing the option or even narrowing the members to the "*purchasing* members." (OA § 9.5.) Read this way, it is the Estate that must initiate the Buy-Sell, and the Buy-Sell process occurs regardless of whether the remaining members elect their option.

51.     On the other hand, if consideration of the members' option is *not* necessary to trigger valuation of the interest, then the language of Section 9.9 (limiting transfer of the interest to a decision of the members not to elect the option) is inconsistent. Moreover, Section 9.5 contemplates a transaction that is limited to the Estate and the members. However, Sections 9.3 and 9.9 contemplate the potential for a transfer to "any Person." There is obvious discordance.

52.    The Court determines, then, that the Operating Agreement with its amended Section 9.5 is internally inconsistent, creating an ambiguity in this contract. Plaintiffs have pled that a breach occurred when IOMAXIS and Buhr allegedly did not provide the Estate (and now the Trust) the financial information necessary to value Decedent's interest in IOMAXIS. Plaintiffs have also pled that they require information, and that legal remedies are insufficient.

53.    Therefore, it is not for the Court, at this early stage and based on this record, to rule out an interpretation of the Operating Agreement that would support Plaintiffs' demand for specific performance. *See Dockery v. Quality Plastic Custom Molding, Inc.*, 144 N.C. App. 419, 422 (2001) ("Ambiguity exists where the contract's language is reasonably susceptible to either of the interpretations asserted by the parties."); *WakeMed v. Surgical Care Affiliates, LLC*, 243 N.C. App. 820, 827 (2015) ("interpretation of an ambiguous contract is best left to the trier of fact").

54.    Accordingly, the Court DENIES the IOMAXIS Defendants' request that it enter an order at this stage precluding the remedy of specific performance.

C.    Equitable Accounting

55.    The IOMAXIS Defendants also move to dismiss Plaintiffs' demand for an accounting. They argue that the Trust has not asserted a claim that would support an accounting, and even if it has such a claim, the Trust has not alleged that it lacks an adequate remedy at law. The IOMAXIS Defendants further argue that neither Chapter 57D nor the operating agreement provides Plaintiffs with information rights. Lastly, to the extent the Estate alleges that it requires the information to file its tax

returns, the IOMAXIS Defendants contend that the Estate is not a party to this lawsuit and therefore has no standing to seek such a remedy. (Defs' Br. 10–12.)

56. Plaintiffs respond that the need for an equitable accounting arises out of the Defendants' breach of the Operating Agreement.[12] They read the Operating Agreement, with its amendment, to require a valuation of the economic interest, and they argue that Defendants have thwarted their efforts to obtain the information necessary for a reliable appraisal. (Pls' Br. 10.)

57. While styled as a "claim," the Plaintiffs' request is better fashioned as a demand for the remedy of an equitable accounting. *See Gottfried v. Covington*, 2014 NCBC LEXIS 26, at **16–17 (N.C. Super. Ct. June 25, 2014). Such a remedy, which most often results when there is a breach of a fiduciary duty, is distinct from an interest holder's information rights afforded by statute or operating agreement. *Compare Burgess v. Burgess*, 205 N.C. App. 325, 333 (2010) ("An accounting is an equitable remedy sometimes pled in claims of breach of fiduciary duty"), *with* N.C.G.S. § 57D-3-04 (statutory information rights).

58. The scope and depth of the remedy of equitable accounting depends on the nature of the harm and the information necessary to remedy that harm. An equitable accounting can be specific and deep, or it can be general and cover a breadth of information. It can be as simple as an order to produce records, or it can involve an extensive audit by a neutral third-party. Fashioning the appropriate remedy

---

[12] The Trust further alleges that it is unable to discharge its fiduciary obligations to its beneficiaries without knowing the value of the asset it holds. (Am. Compl. ¶ 92.)

depends on the circumstances and is in the equitable powers of the Court. *See, e.g., Alkemal Sing. Private Ltd. v. Dew Glob. Fin., LLC*, 2018 NCBC LEXIS 36, at **52–53 (N.C. Super. Ct. Apr. 19, 2018) ("The remedy of an equitable accounting may be available when a plaintiff has asserted a valid claim for relief in equity and an accounting is necessary to compel discovery of information regarding accounts held exclusively by the defendant.") (quoting *Mkt. Choice, Inc. v. New England Coffee Co.*, 2009 U.S. Dist. LEXIS 73627, at *35–36 (W.D.N.C. Aug. 18, 2009) (applying North Carolina law); *Watson v. Fulk*, 19 N.C. App. 377, 380 (1973) ("The appropriate method for determining the exact amount which may be due the plaintiff, if anything, is to require the defendant, who is in possession of the essential information, to render an accounting.").

59. There must be a claim to support such a remedy, however. The Court concludes, based on a review of the Amended Complaint in its entirety, that Plaintiffs have asserted one or more such causes of action. Moreover, they have asserted that it is information they require, not a remedy at law. *Gottfried*, 2014 NCBC LEXIS 26, at **16 (pleadings must allege that plaintiff lacks adequate remedy at law).

60. Nevertheless, the Court holds that it is premature to determine whether an equitable accounting would be an appropriate remedy in this case.[13] *Cf. Brakebush Bros., Inc. v. Certain Underwriters at Lloyd's of London*, 2021 NCBC LEXIS 98, at **41 (N.C. Super. Ct. Nov. 1, 2021) (too early to decide on Rule 12(b)(6)

---

[13] In some circumstances, a plaintiff may obtain the information needed to assess a claim for damages through discovery. *See, e.g., Gottfried*, 2014 NCBC LEXIS 26, at **16–17.

motion whether Plaintiff would be entitled to recover consequential damages if it ultimately prevailed); *Fleming v. Horner*, 2021 NCBC LEXIS 33, at *23 (N.C. Super. Ct. April 1, 2021) (too early at Rule 12(b)(6) stage to decide whether to dismiss punitive damages request); *Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, at *145–46 (N.C. Super. Ct. Dec. 31, 2019) (denying a motion to dismiss to the extent that punitive damages were sought as a remedy).

61. Accordingly, the IOMAXIS Defendants' Motion to Dismiss the Trust's "claim" for equitable accounting, to the extent it is a demand for relief, is **DENIED**.

62. Finally, it is undisputed that the Estate is not a party to this action and has no standing to assert a demand for relief. Therefore, the IOMAXIS Defendants' Motion to Dismiss any demand on the part of the Estate itself for an equitable accounting is **GRANTED**.

### D. The Individual Defendants

63. With respect to Plaintiffs' first three claims (declaratory judgment, breach of the right to receive interim distributions, and accounting) Buhr, Spade, Griffin, and Burleson (the "Individual IOMAXIS Defendants") each move to dismiss the claims "[t]o the extent that the Trust seeks monetary damages" from them because the Trust has not asserted a claim for personal liability against any of them. (Defs' Br. 10.)

64. Plaintiffs respond that the Individual IOMAXIS Defendants have mischaracterized the Amended Complaint. They assert that the individuals are included in this declaratory judgment action "as a matter of statutory requirement

per N.C. Gen. Stat. § 1-253 *et seq.*" and only "to the extent that they have any claim or interest in IOMAXIS, or any distributions by IOMAXIS, that would be affected by this declaratory judgment action or any claims asserted herein."  (Pls' Br. 9.)

65.    By statute, "When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceedings."  N.C.G.S. § 1-260.

66.    Accordingly, the Court determines that, as to Plaintiffs' first three claims for relief, the individual defendants have been named because Plaintiffs seek a declaratory judgment that could impact the individual defendants' interests in, and distributions from, IOMAXIS.  To the extent that the Motion of Defendants Buhr, Spade, and Griffin[14] is intended to clarify that no other relief is sought from them individually on the first three claims, the Motion is **GRANTED**.

67.    In making this determination, the Court does not address the viability of Plaintiffs' Fourth (fraud) and Fifth (Uniform Voidable Transaction Act) Claims for Relief with respect to any defendant.  Given the pendency of the IOMAXIS Defendants' appeal to the Supreme Court of North Carolina, this Court has stayed all proceedings with respect to those claims and their accompanying demands.  (*See* Order Mot. Sever and Stay, ECF No. 283.)

---

[14] The Court does not address the Motion as to Burleson because it is stated in the alternative to Burleson's motion to dismiss for lack of *in personam* jurisdiction.  The latter motion is stayed pending resolution of the IOMAXIS Defendants' appeal of this Court's earlier order. (*See* ECF Nos. 198, 283.)

## IV. CONCLUSION

68. WHEREFORE, the Court hereby **ORDERS** that the IOMAXIS Defendants' Consolidated Motion to Dismiss the Trust's First Amended Complaint is **GRANTED** in part, **DENIED** in part, and **STAYED** in part, as follows:

   a. The IOMAXIS Defendants' Motion to Dismiss the Trust's claims on the basis that the Trust lacks standing is **DENIED**.

   b. The IOMAXIS Defendants' Motion to Dismiss the Estate's demands for relief on the basis that the Estate lacks standing is **GRANTED**, without prejudice.

   c. The IOMAXIS Defendants' Motion to Dismiss the Trust's demands for specific performance and for equitable accounting is **DENIED**.

   d. Except as to Burleson, the Individual IOMAXIS Defendants' Motion to Dismiss is **GRANTED** with prejudice to the extent Plaintiffs seek relief beyond that afforded by the Declaratory Judgment Act. As to Burleson, this Motion is **STAYED**.

   e. A determination of Burleson's Motion to Dismiss pursuant to Rule 12(b)(6), stated in the alternative to his Motion to Dismiss pursuant to Rule 12(b)(2), is **STAYED**.

   f. A determination of the balance of the IOMAXIS Defendants' Motion to Dismiss is **STAYED** pending resolution of the

IOMAXIS Defendants' appeal of this Court's Order, (ECF No. 198).

g. The parties shall meet and confer and submit a new Case Management Report to the Court pursuant to Business Court Rule 9 by 5:00 P.M. on or before 5 January 2023.

IT IS SO ORDERED, this the 5th day of December, 2022.

/s/ Julianna Theall Earp
Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases